# EXHIBIT 1

EXHIBIT A

# Exhibit A
## Proof of Claim of Patch Services, LLC

In re Beverly Jane Cary
20-12450

1.	The claim of Patch Services, LLC, doing business as Noah ("Claimant"), arises out of a Real Estate Purchase Option Agreement ("Agreement") entered into by and between Claimant and Beverly J Cary ("Debtor") dated July 18, 2019. A true and correct copy of the Agreement is attached hereto as <u>Exhibit B</u> and incorporated as though fully set forth herein.

2.	Pursuant to the Agreement, and as set forth in detail in the Agreement, Debtor granted to Claimant an exclusive and irrevocable Option to purchase an undivided fractional interest in real property commonly known as 27834 31st Pl S, Auburn, WA 98001 with the legal description set forth in Exhibit A to the Agreement ("Property") equal to the Designated Percentage of the Property specified in Exhibit C to the Agreement (57.91%), in exchange for the Exercise Price determined in accordance with Exhibit C and on the terms and conditions set forth in the Agreement. In accordance with the Agreement, as partial consideration for the Option and at the time of the Agreement, Debtor received the Option Fee of $62,000.

3.	Claimant's interest in the Property is secured by a Deed of Trust recorded on August 21, 2019 in the official records of King County, Washington. A true and correct copy of the Deed of Trust is attached hereto as <u>Exhibit C</u> and incorporated as though fully set forth herein.

4.	Claimant reserves the right to amend and/or supplement this Proof of Claim in any respect.

5.	Claimant reserves the right to object to this Court's subject matter jurisdiction. Neither the filing of this Proof of Claim, nor any subsequent appearance, pleading, claim, proof of claim, document, suit, motion, nor any other writing or conduct shall be deemed or construed as: (i) a waiver or release of Claimant's rights against any person, entity, estate or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein or therein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related thereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such right to jury trial is pursuant to statute or the United States Constitution; (iv) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver or release of Claimant's right to have any and all final orders in any and all non-core

matters or proceedings entered only after de novo review by a United States District Court Judge; (vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; (vii) an election of remedies; (viii) a waiver or release of any right of setoff or recoupment that Claimant may hold against the Debtor; or (ix) a waiver or release of any of Claimant's other rights, claims, actions, defenses, or other matters to which Claimant is entitled under any agreements or at law or equity or under the United States Constitution.

# EXHIBIT B

# PATCH SERVICES LLC REAL ESTATE PURCHASE OPTION AGREEMENT

This **PATCH SERVICES LLC REAL ESTATE PURCHASE OPTION AGREEMENT** ("**Agreement**") is entered into as of _July 18_, 20_19_ ("**Effective Date**"), by and between Beverly J Cary (individually or collectively, "**Owner**") and **PATCH SERVICES LLC.**, a Delaware corporation ("**Investor**"). For purposes of this Agreement, the term "Investor" shall include, without limitation, any successor or assignee of Investor.

## RECITALS

**A.**    Owner holds legal title to certain residential real property, as more particularly described on attached <u>Exhibit A</u> ("**Property**").

**B.**    Owner and Investor are entering into this Agreement: (i) to grant to Investor the option to purchase an undivided fractional interest in the Property ("**Option**"); (ii) to specify the respective rights and obligations of Owner and Investor with respect to the Property; and (iii) to preserve the value of the Property, pending, and subsequent to, the exercise of the Option by Investor.

**C.**    Concurrently with entering into this Agreement, Owner and Investor are entering into a Memorandum of Agreement, the form of which is attached hereto as <u>Exhibit F</u> ("**Recorded Memorandum**").

**D.**    Concurrently with entering into this Agreement, Owner is executing a Deed of Trust (Non-Recourse) and Security Agreement or a Mortgage (Non-Recourse) and Security Agreement, the form of which is attached hereto as <u>Exhibit G</u> ("**Security Instrument**").

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, OWNER AND INVESTOR AGREE AS FOLLOWS:

**1.**    **Definitions.**  Capitalized terms used in this Agreement shall have the meanings specified in <u>Exhibit B</u> to this Agreement or elsewhere herein, or if not defined in this Agreement, in the specified Transaction Documents.

**2.**    **Real Estate Purchase Option.**

**2.1**    **Grant of Real Estate Purchase Option.**  As of the Effective Date, Owner hereby irrevocably grants to Investor an exclusive and irrevocable Option to purchase an undivided fractional interest in the Property, equal to the Designated Percentage of the Property specified in <u>Exhibit C</u> to this Agreement, in exchange for the Exercise Price determined in accordance with <u>Exhibit C</u> and on the terms and conditions set forth below.

**2.2**    **Consideration.**   As partial consideration for the Option, and as consideration for Owner's obligations hereunder, Investor agrees to pay to Owner concurrently

herewith the Option Fee ("**Option Fee**") and the Covenant Fee (**"Covenant Fee"**) specified in Exhibit C, and simultaneously the Owner shall pay Investor the Servicing Fees specified in Exhibit C and all Closing Costs. The Option Fee paid by Investor to Owner shall be retained by Owner as consideration for this Agreement regardless of whether the Option is exercised or expires. In no event will Owner be required to return or repay to Investor the Option Fee or the Covenant Fee; provided, however, that the foregoing shall not limit any payments due Investor under this Agreement upon exercising the Option.

      **2.2.1** The recordation of the Recorded Memorandum shall be conclusive proof of delivery to, and acceptance by, Owner of the Option Fee and the Covenant Fee.

      **2.2.2** As further consideration for the Option, and except as specifically provided in this Agreement, Investor has waived any legal or equitable right of occupancy or possession of, and right to partition, the Property pursuant to this Agreement.

      **2.3** **Term of Option.** The term of the Option ("**Term**") shall commence on the Effective Date and shall expire at 11:59 p.m., Pacific Time, on the day immediately preceding the Expiration Date.

      **2.4** **Exercise of Option.** Investor may, but is not obligated to, exercise the Option only under any of the following circumstances:

      **2.4.1** Concurrently with, immediately prior to, or subsequent to, any sale, exchange or other transfer of the Property (including a transfer resulting from the death of the last Owner), or any portion of the Property;

      **2.4.2** Any time after a date which is six (6) months prior to the Expiration Date (up to and including the Expiration Date); or

      **2.4.3** If and upon: (i) any event of insolvency of any Owner, including but not limited to the commencement of any voluntary or involuntary bankruptcy proceeding by or against any Owner or the appointment of a receiver or a conservator of the affairs of any Owner; (ii) any taxes on the Property become delinquent; (iii) the transfer or attempted transfer of the Property, or any interest in the Property, by any Owner except in accordance with the provisions of this Agreement; (iv) in the event the Property is Owner's Principal Residence (as indicated on Exhibit C), the Owner ceases to occupy the Property as Owner's Principal Residence; (v) unless Investor has provided prior written permission to Owner, the Property is used for any commercial purpose or as anything other than a single family home; (vi) the death of Owner, or of the last of the Owners if there is more than one Owner, or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor; (vii) any lien or security interest that is not approved by Investor in writing attaches to the Property; (viii) any loans that are secured by liens on the Property become delinquent or are subject to an event of default (whether or not such loans or liens have been approved or subordinated to by Investor); (ix) Owner fails to maintain, preserve or repair the Property to the standards and in the manner specified in this Agreement; (x) insurance on the Property is not maintained in the amounts and against the hazards specified in this Agreement; (xi) any breach by Owner of the representations or warranties or any breach of any covenant contained in this Agreement; (xii) any assignment,

- 2 -

attempted assignment, or other transfer of this Agreement, unless prior approval is given by Investor in its sole discretion; (xiii) the principal amount of indebtedness secured by the Property exceeds the Maximum Authorized Debt specified in Exhibit C ("**Maximum Authorized Debt**"); (xiv) a receiver is appointed for the Property, for any Owner or the Trust; and/or (xv) any other action or event occurs which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, Investor's right to exercise the Option or Investor's contingent interest in the Property, including, but not limited to, condemnation or destruction of the Property by fire or other event.

## 2.5    Notice of Option Exercise.

**2.5.1**  If Investor chooses to exercise the Option based upon the occurrence of one or more of the events listed in Section 2.4 above (each, a "**Specified Event**, or collectively, the "**Specified Events**"), Investor shall deliver to Owner written notice of Investor's Option exercise which identifies the Specified Event(s) which has occurred (a "**Notice of Option Exercise**").

**2.5.2**  Upon receipt of the Notice of Option Exercise, Owner shall have thirty (30) days to: (1) cure, if possible, the underlying Specified Event(s) listed in Section 2.4.3, or (2) notify Investor of Owner's intent to terminate the Option pursuant to Section 9.2 of this Agreement, in which event Owner must complete the Owner Termination within sixty (60) days of delivery of the Notice of Option Exercise.  The notice and cure periods in this paragraph will run concurrently (and not sequentially) with any notice and cure periods set forth in Section 19 of this Agreement.  If Owner does not take and complete any of the actions set forth in clause (1) and (2) of this paragraph within the prescribed time periods, Investor may exercise the Option and proceed to close in accordance with Section 4 hereof.

**2.5.3**  Notwithstanding the foregoing or anything to the contrary in this Agreement or any of the other Transaction Documents, upon the death of the last Owner or, if an Owner is the Trustee of a Revocable Trust, upon the death of the last surviving Trustor of the Revocable Trust, Investor's right to exercise the Option shall expire upon the date which is five (5) years after Owner or Owner's successor in interest notified Investor of such death, but in no event later than the Expiration Date.

**2.5.4**  If Investor does not deliver a Notice of Option Exercise on or before the Expiration Date, Investor shall have no further rights under this Agreement or the other Transaction Documents to exercise or extend the Option.

## 2.6    Assignment By Investor.

**2.6.1**  Investor may assign, in whole or in part, all of its right and title to, and interest in, this Agreement at any time and to any Person without prior notice to, or consent of, Owner.  In connection with any assignment, Investor may disclose any and all documents and information that Investor has, or may hereafter have, relating to Owner and the Property, subject to assignee's agreement to continue to observe Investor's policies regarding privacy and disclosure of personal and financial information.  Upon such assignment the assignee shall automatically have all rights, remedies, and obligations of Investor under this Agreement.

- 3 -

**2.6.2** In the event of any sale or other transfer of the Property, Investor may assign its Option to the buyer or transferee of the Property (with the choice between exercising the Option and assignment being in Investor's sole discretion) and Investor shall deliver to Owner written notice of Investor's election to assign (a "**Notice of Option Assignment**"). In such event, Owner, Investor and the buyer/transferee shall enter into an assignment, assumption and escrow agreement in form and substance reasonably acceptable to Investor.

## 2.7    Termination.

**2.7.1    Termination Conditions.**    The Option shall terminate, and thereafter Investor shall have no further interest whatsoever in the Property pursuant to this Agreement, under any of the following conditions:

    **i**    unless Investor is stayed or enjoined from exercising the Option (whether by bankruptcy or otherwise), if the Option is not exercised before the Expiration Date;

    **ii**    the Option is terminated by Owner pursuant to Section 9.2 of this Agreement;

    **iii**    Investor voluntarily terminates this Agreement;

    **iv**    Investor acquires title to one-hundred percent (100%) of the Property, whether by exercise of Investor's Right of First Refusal or otherwise;

    **v**    the Property is sold to Owner upon Owner's exercise of the Right of First Refusal pursuant to Section 12.7 of this Agreement;

    **vi**    the Property is destroyed and the insurance proceeds are paid to Investor in the full amount and in the manner specified in this Agreement; or

    **vii**    the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to Investor in the full amount and in the manner specified in this Agreement.

**2.7.2    Injunction.**    Notwithstanding anything to the contrary in this Agreement, if Investor is stayed or enjoined from exercising the Option (whether by bankruptcy or otherwise), this Option shall not expire until ninety (90) days after such stay or injunction is lifted by a final, non-appealable order of the appropriate court.

**2.7.3    Owner's Right of Termination.**    Owner shall have the right, but not the obligation, to terminate the Option pursuant to the terms of Section 9.2 of this Agreement.

**2.7.4    Release.**    If the Option expires or terminates, Investor will, if requested in writing by Owner, execute, acknowledge and deliver a quitclaim deed to Owner within thirty (30) days after such request and will execute, acknowledge and deliver any other

- 4 -

documents reasonably requested in writing by any title company to remove from the Property the liens or encumbrances created pursuant to or in connection with the Transaction Documents.

**2.8    Recorded Memorandum.**    Concurrently with entering into this Agreement, Owner has executed and delivered the Recorded Memorandum and consents to Investor recording same.

**2.9    Security Instrument.**    Concurrently with entering into this Agreement, Owner has executed and delivered the Security Instrument and consents to Investor recording same.

**2.10    True Option; No Loan.**    Owner recognizes and agrees that by entering into this Agreement, Owner is <u>not</u> obtaining a loan from Investor, but instead is granting an Option to Investor and thereby the right to purchase a fractional interest in the Property and become a co-owner in the Property. If Investor allows the Option to lapse, Owner shall not be obligated to return or repay the Option Fee.

**3.    Representations, Warranties and Covenants of Owner.**

**3.1    In General.**    The representations, warranties and covenants contained in this Section 3 are made by Owner to induce Investor to enter into this Agreement. Therefore, the representations, warranties and covenants of Owner in this Section 3 shall be deemed made and renewed on and as of: (i) the Effective Date; (ii) the date a Notice of Option Exercise or Notice of Option Assignment is delivered by Investor under this Agreement; and (iii) if the Option is exercised or assigned, the date the purchase of the Designated Percentage of the Property, or the assignment of the Option, is consummated. The truth, accuracy and completeness of the representations, warranties and covenants set forth in this Section 3 at and as of each aforementioned date are a condition precedent to any and all of Investor's obligations under this Agreement and shall survive the termination of this Agreement.

**3.2    Capacity; Accuracy.**    Owner has full legal capacity to enter into the Transaction Documents and upon execution and delivery, this Agreement and the other Transaction Documents will constitute legal, valid and binding agreements and obligations of Owner in accordance with their terms. If Owner is/are the Trustee(s) of a Revocable Trust: (i) such trust has been duly formed; (ii) the Trustee(s) of such trust have the capacity and authority to enter into the Transaction Documents; and (iii) copies of all trust documents (and all amendments and supplements) have been delivered to Investor. Each representation and warranty made by Owner in this Agreement, the other Transaction Documents and all other documents and instruments delivered by Owner in connection with this Option Transaction (including Owner's application for this Option Transaction), is true and correct at the time such representation or warranty was made, given or deemed given.

**3.3    Title to Property.**    Owner represents and warrants that Owner is the owner of the Property and has marketable and insurable fee simple title to the Property free of restrictions, leases, liens and other encumbrances or interests, except as specifically identified in the Option Title Insurance Policy and (as to representations that are deemed to be made as of the

- 5 -

times contemplated in clauses (ii) and (iii) of Section 3.1 of this Agreement) except with respect to Approved Subsequent Liens.

**3.4** __No Claims or Foreclosures.__ There is no material lawsuit, tax claim, condemnation proceeding, or other dispute pending or threatened against Owner or, to the best of Owner's knowledge, the Property. The Property is not subject to any foreclosure proceeding, nor has Owner received or is aware of any: (i) default or notice of default with respect to any loan or other obligation secured by the Property; (ii) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (iii) information or notice that the Property is to be sold or foreclosed upon by a party holding a lien on the Property.

**3.5** __No Advice.__ **In entering into the Transaction Documents and into any future Ultimate Sale, Owner is not relying and shall not rely on any information or representation that may have been provided by Investor, its agents, its affiliates, or any of their officers, employees or agents, regarding: (i) the value of the Property; (ii) the advisability of entering into the Transaction Documents or an Ultimate Sale, or of exercising a Right of First Refusal; or (iii) the tax implications and consequences of entering into the Transaction Documents or an Ultimate Sale, or of exercising a Right of First Refusal. Owner has made, and will make, his, her or its own investigation regarding such matters and has been advised by Investor to discuss them with Owner's legal, financial and tax advisors, as well as with family members.**

**3.6** __No Violations.__ Owner has no knowledge of or information concerning any violations of any laws or regulations relating to the Property and no knowledge that any operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by Owner or others are not, have not been or will not be in all material respects in compliance with all state, federal and local laws and regulations.

**3.7** __Continuing Compliance.__ Owner will comply with all of his, her or its obligations set forth in this Agreement, including, without limitation, the obligation to pay timely the Asset Management Fees imposed by Investor in accordance with Section 7.7 below.

**3.8** __No Broker; Finder; No Commissions, Fees.__ This Agreement, the Security Instrument, the Recorded Memorandum and the transaction evidenced by them were initiated, originated, and entered into directly between Investor and Owner. No broker, finder, source of leads, or other third party was involved in the making of such agreements, and no third party is entitled to be paid a commission, fee or other compensation or remuneration in connection therewith.

**3.9** __Documentation and Information Supplied by Owner; Financial Condition of Owner.__ Owner's application to Investor and all financial and other documentation and other information supplied or made available by Owner as part of applying for, or in connection with entering into, the Option Transaction is truthful, complete, not misleading, and fairly and accurately reflects the financial condition of Owner as of (i) the date supplied, (ii) the Effective Date of this Agreement. There has been no material change in Owner's financial condition since Owner's application to Investor.

- 6 -

**3.10    Conflict; Enforceability.**  Owner represents and warrants that:

**3.10.1  Conflict.**    The execution and delivery of the Transaction Documents, the incurrence of the obligations set forth in those documents, the consummation of the transactions contemplated by, or compliance with the terms of, those documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which Owner is a party or by which any portion of the Property may be bound.  If Owner is a Trustee of a Revocable Trust, the execution of the Transaction Documents has been authorized and is within Owner's, all Trustees' and all Trustors' powers.

**3.10.2  Enforceability.**    The Transaction Documents and all other documents required to be executed by Owner in connection with the Transaction Documents are valid, legally binding obligations of, and enforceable against, Owner and Trustor(s) and any successors or assignees in accordance with their terms.

**3.11    Lawsuits.**  There is no litigation, arbitration or other legal proceeding pending or, after Owner's due and diligent inquiry and to the best of Owner's knowledge, threatened against Owner that arises out of the ownership of the Property or that might affect the Property or the value of the Property or adversely affect the ability of Owner to perform his, her or its obligations under this Agreement.  Owner shall promptly notify Investor promptly of any such lawsuit, arbitration or legal proceeding of which Owner becomes aware.

**3.12    Proceedings Against Property.**  Owner does not have knowledge of any foreclosure, condemnation, environmental, zoning or other land-use regulation proceedings, either instituted or planned to be instituted, which would affect the use, operation or value of the Property, nor has Owner received written notice of any tax, special assessment or other proceedings affecting the Property.   Owner shall notify Investor promptly of any such proceedings of which Owner becomes aware.

## 4.    Option Exercise Procedures; Closing of Purchase of Designated Percentage.

**4.1    Escrow.**  To exercise the Option, Investor shall deliver to Owner a Notice of Option Exercise.  Concurrently with delivery of a Notice of Option Exercise, Investor shall open an escrow with a title company ("**Escrow Agent**"). This Agreement shall serve as initial escrow instructions to the Escrow Agent, subject to any other or additional escrow instructions provided by Investor.  The closing of the purchase of the Designated Percentage of the Property or the assignment of the Option pursuant to Section 2.6.2 of this Agreement shall occur at a date and time mutually convenient to Owner and Investor ("**Closing Date**"), but in no event shall the closing occur more than thirty (30) days after the date of a Notice of Option Exercise or Notice of Option Assignment unless the closing has been extended by the prior written consent of Investor, which consent may be granted or withheld in Investor's sole discretion.  The parties shall each do, or cause to be done, such other acts and things (including but not limited to the

- 7 -

preparation of additional escrow instructions) as shall be reasonably necessary to close the transactions contemplated in this Agreement.

      **4.2**    **Owner's Deliveries.**  On or prior to the Closing Date, Owner covenants and agrees to deliver or cause to be delivered to the Escrow Agent the following:

      **4.2.1**  a statutory warranty deed, executed by Owner and notarized, in form and substance reasonably acceptable to the Investor and Escrow Agent, that, when recorded, will deliver to Investor, or its assignee, good and marketable fee simple title to the Designated Percentage of the Property, subject to: (i) the standard printed exceptions described in the policy of title insurance covering the Property; (ii) the standard printed exceptions of the Escrow Agent, if any; and (iii) the Permitted Encumbrances, provided that all outstanding monetary obligations under the Permitted Encumbrances are not delinquent;

      **4.2.2**  an appropriate Real Estate Excise Tax Affidavit;

      **4.2.3**  the Closing Costs set forth in Section 4.4 below;

      **4.2.4**  any documents or other instruments that may be required by the Escrow Agent in connection with the issuance of an owner policy of title insurance acceptable to Investor; and

      **4.2.5**  the appropriate affidavits, certificates or notices as may be required by federal or state law, in form reasonably satisfactory to Investor and Escrow Agent.

      **4.3**    **Investor's Deliveries.**  On or prior to the Closing Date, Investor covenants and agrees to deliver or cause to be delivered to the Escrow Agent the following:

      **4.3.1**  any preliminary change of ownership report (or similar document) required under applicable state or local law;

      **4.3.2**  the Remaining Portion of the Exercise Price; and

      **4.3.3**  any documents or other instruments in Investor's possession that may reasonably be required by the Escrow Agent in connection with the issuance of a policy of title insurance acceptable to Investor or its assignee.

      **4.4**    **Closing Costs.**  Owner shall pay all the Closing Costs; provided, however, that Owner shall be fully responsible for all ordinary and necessary Property expenses (including property taxes, any homeowner association dues, utility charges and insurance charges) through the Closing Date and any such expenses shall be prorated between the Owner and Investor thereafter, based on their respective ownership interests.

      **4.5**    **Title Insurance.**  At Investor or its assignee's election, Investor or its assignee will be provided with an owner policy of title insurance effective as of the Closing Date, which insures Investor or its assignee with good and marketable title to the Designated Percentage of the Property, in fee simple and free of any liens or encumbrances of whatever character, except for the Permitted Encumbrances, but otherwise in form and substance

- 8 -

acceptable to Investor or its assignee.  Owner will be responsible for the cost of such policy of title insurance.

      **4.6**    **Obligations of Owner.**  To the extent there are any outstanding amounts, including any loans, that are the obligation of Owner to pay and payment of which must be made by Owner at or prior to the Closing Date by Investor in order to permit Investor's acquisition of an interest in the Property free and clear of liens, Owner and Investor agree, and Investor is hereby irrevocably authorized and directed, to disburse through escrow from the amounts that are owed to Owner, all amounts necessary to satisfy such obligations in full.  If such amounts are not sufficient to satisfy such obligations, Owner shall pay and fully satisfy them with Owner's separate funds.

      **4.7**    **Closing Escrow.**  If, on the Closing Date, the Escrow Agent holds and is irrevocably prepared to deliver the documents and funds described in Sections 4.2, 4.3, 4.4, 4.5 and 4.6 above, and can record the grant deed, then the Escrow Agent shall, as promptly thereafter as practicable:

           **4.7.1**   record the grant deed and deliver it to the appropriate party;

           **4.7.2**   deduct all items chargeable to the account of any party from the funds provided by or due to that party and refund any remainder, as appropriate; and

           **4.7.3**   deliver net sale proceeds to Owner, net of amounts chargeable to Owner as shown on the settlement statement.

      **4.8**    **Effect of Assignment.**  If Investor elects to assign the Option pursuant to Section 2.6.2 of this Agreement, Investor shall assign and deliver to the assignee all rights under the Transaction Documents in form and substance acceptable to Investor.  Investor and Owner shall execute and deliver in recordable form, if requested, such other documents as are necessary to reflect the assignment of the Option and the other Transaction Documents.

           **4.8.1**   Upon any such assignment by Investor and assumption by assignee, the assignee shall have the same rights and obligations granted to Investor hereunder, including without limitation, the right to make and compel the deliveries provided above.

           **4.8.2**   As an alternative, if the Investor's assignee also has purchased Owner's interest in the Property and recorded a deed to the Property which conveys Owner's fee simple estate in the Property to assignee, then the assignee may thereafter elect to have the rights under the Option merge with the fee simple estate in the Property and thereafter record such documents as may be required by the title company which shall insure assignee's interests in the Property.  Investor and Owner agree to cooperate with such assignee and execute such additional documents as may be reasonably necessary to document assignee's interest in the Property.

           **4.8.3**   Investor shall not be responsible for the cost of any recording or for any policy of title insurance premiums which may accrue in connection with any assignment made pursuant to this Section 4.8.

**4.9** **Sales Commissions.** If either Owner or Investor has used the services of a real estate broker, agent or other professional in connection with the transactions described in, or contemplated by, this Agreement, that party who retained such services shall be solely responsible for any fee or commission that may be owed to such broker, agent or professional and shall indemnify and hold harmless the other party from any and all claims, liability (including Attorneys' Fees), costs or charges assessed or assert by such broker, agent or professional.

**4.10** **Other Documents.** To the extent additional documents are to be delivered to Investor in connection with this Agreement or the other Transaction Documents, Investor shall have the right to require delivery of such additional documents after the closing contemplated in this Section 4.

**5.** **Term and Termination.**

**5.1** **Term.** The term of this Agreement shall commence on the Effective Date and shall expire on the Termination Date.

**5.2** **Termination.**

**5.2.1** Investor may voluntarily terminate this Agreement at any time by unilaterally delivering to Owner a written notice of termination duly signed, dated and notarized by Investor. In addition, the occurrence of any of the following events shall constitute a termination of this Agreement:

| | |
|---|---|
| i | this Agreement is terminated by Owner pursuant to Section 9.2 below; |
| ii | the Ultimate Sale of the Property by Owner is closed pursuant to Section 11 below; |
| iii | the Ultimate Sale of the Property by Investor is closed pursuant to Section 12 below; |
| iv | Investor acquires title to one hundred percent (100%) of the Property whether pursuant to Section 11.7 below or otherwise; |
| v | the closing of the sale of the Property to Owner upon Owner's exercise of the Right of First Refusal pursuant to Section 12.7 below; |
| vi | if the Property has been destroyed, as described in Section 15.2 below, and provided the insurance proceeds are sufficient to pay in full the insurance allocation owed to Investor as specified in Section 15.2.1 below, then on the date that the specified insurance proceeds have been paid to Investor; or |

- 10 -

| vii | if the Property has been condemned, in whole and not in part, as described in Section 16 below, then on the date that the condemnation proceeds are paid to Investor as provided in Section 16 below. |

**5.2.2**   Termination of this Agreement pursuant to this Section 5.2 shall also automatically terminate the Recorded Memorandum.

**5.2.3**   Upon termination of this Agreement, Investor and Owner will each deliver such quitclaim deed and/or other instrument as may reasonably be requested by the other party.

**5.3**   **Survival.**   The following obligations shall survive any termination of this Agreement:  (i) the obligations relating to Owner Termination under Sections 9.2.4 and 9.2.5 below; (ii) the indemnification provisions of Sections 17.3 and 20 below; (iii) the obligations to repay any and all Protective Advances and Asset Management Fees outstanding on the Termination Date, to the extent permitted by law; (iv) the obligation to remove any liens on the Property and pay any Sales Commissions under Sections 11.2 and 12.5 below; (v) the obligation to pay any Appraisal Expenses, including under Section 12 below; and (vi) any provisions expressly stated herein to survive termination.

**6.**   **Consideration.**

**6.1**   **Payments and Other Consideration.**   As consideration for Owner's obligations under this Agreement, Owner shall receive: (i) the Covenant Fee; (ii) Investor's performance under this Agreement; (iii) the right of sole occupancy, as set forth in Section 9.1 below; (iv) the delayed exercise of Investor's Option rights as expressly provided herein; (v) Investor's waiver of the right to partition as expressly provided herein; and (vi) such other rights and benefits as are expressly provided to Owner under this Agreement.  Owner shall not be required to return or repay any part of the Covenant Fee or the Option Fee; provided, however, that the foregoing shall not limit any payments owed to Investor under this Agreement pursuant to its Designated Percentage.

**6.2**   **No Interest.**   Under no circumstances (other than those described in Section 10.2 of this Agreement regarding any Protective Advances) shall Owner be required to pay any interest to Investor.

**6.3**   **No Additional Payments.**   Except as specifically set forth in this Agreement, Owner shall not be entitled to any additional consideration, compensation or reimbursement from Investor in exchange for the performance by Owner of the obligations and covenants set forth in this Agreement.

**7.**   **Duties of Owner.**   To preserve and protect Investor's Interest and in exchange for the Covenant Fee, Owner covenants to take the following actions at Owner's sole expense, for so long as this Agreement has not terminated or been terminated:

**7.1**   **Maintenance and Repair.**   Owner shall:  (i) maintain the Property in good condition; (ii) prevent any waste, deterioration or decrease in value due to condition

- 11 -

(ordinary wear and tear excepted); (iii) periodically perform such repairs as are customary and reasonable for similar properties in similar locations; and (iv) ensure that any operations or activities upon, or use or occupancy of, the Property or any portion of the Property will, in all material respects be in compliance with all state, federal and local laws and regulations, including, without limitation, any applicable laws requiring flood, earthquake or other specific hazard insurance. In no event shall Owner permit the Property to deteriorate such that its condition shall be worse than its condition described in: (A) the homeowner disclosure statement executed by Owner, and (B) the Property valuation(s), in each case obtained in connection with the origination of the Option (which homeowner disclosure statement and Property valuation(s) are specifically incorporated into this Agreement by this reference); ordinary wear and tear excepted.

       **7.1.1** <u>**No Credit or Offset.**</u> Except with respect to Modification Adjustments in accordance with Sections 7.4 of this Agreement, Investor will not provide Owner with any credit, offset or other compensation for Owner's performance of ordinary maintenance, repairs, or improvements that maintain or improve the condition and value of the Property.

       **7.1.2** <u>**Prompt Repair.**</u> To the extent that any material damage to the Property occurs, including, without limitation, in the event of a fire, flood, earthquake, hurricane or other natural disaster, Owner shall promptly repair such damage subject only to the provisions of Section 15 below regarding the disposition and use of insurance proceeds. Investor shall not be obligated to contribute toward, or be responsible or liable for any portion of, the cost of any such repair for any reason whatsoever.

    **7.2** <u>**Insurance.**</u>

       **7.2.1** <u>**Insurance Coverage.**</u> Owner shall maintain at Owner's own expense: (i) insurance on the Property against fire and other hazards included in the special form (HO-3) policy (and similar successor forms) with only those exclusions customarily associated with special form policies, as well as any other hazards, including flood hazards, for which Investor may from time to time reasonably require insurance and which insurance is common for similar properties in similar locations; and (ii) liability insurance on the Property against such risks and in such amounts as are reasonable for similar properties in similar locations. Such insurance may be obtained from any insurance company reasonably acceptable to Investor and shall be in amounts and include terms (including deductible levels) as Investor may from time to time reasonably require. As of the Effective Date, Investor requires hazard insurance in an amount equal to 100% of the current replacement cost of the improvements on the Property (which amount shall be increased not less frequently than annually as the replacement cost of the improvements increases). Investor shall be named as an insured or in the specific manner required by Investor in writing under all hazard and liability insurance policies obtained by Owner, whether or not such insurance is required by Investor.

       **7.2.2** <u>**Copies and Proceeds.**</u> Copies of all insurance policies shall be furnished to Investor promptly upon issuance, and Owner shall provide Investor with proof of coverage upon request. All proceeds of such policies shall be subject to the provisions of Section 15 below.

- 12 -

**7.2.3** **Failure to Maintain.** If Owner fails to maintain or obtain the insurance coverage required by this Section 7.2, Investor, at Owner's expense, may, but is not obligated to, obtain such coverage on the Property as Investor, in its sole discretion, may deem necessary and appropriate to protect Investor's Interest. All expenses paid by Investor shall be deemed to be Protective Advances. Owner acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Owner could have obtained and may not protect Owner to the same extent as any prior policy Owner might have had.

**7.3** **Taxes and Assessments.** Owner shall promptly pay all taxes and assessments accruing on the Property (including for homeowners associations, special improvement districts, and local improvement districts), except for taxes or assessments that are in good faith dispute and that Owner is diligently challenging. Owner shall not apply for any deferral of taxes or assessments accruing on the Property, including, without limitation, any deferral available to senior citizens, if applicable. If Owner fails to pay any such taxes or assessments, except for taxes or assessments that are in dispute and that Owner is diligently challenging, Investor, in its sole discretion, may pay such taxes or assessments at Owner's expense. Any and all such payments shall be deemed to be Protective Advances. Owner shall provide Investor with proof of payment of taxes or assessments upon request.

**7.4** **Prohibited Use.** Owner shall not (i) use the Property in any way other than as a single family residence, (ii) in the event the Property is the Owner's Principal Residence (as indicated on Exhibit C), cease to occupy the Property as Owner's Principal Residence, (iii) use or permit the use of the Property for any commercial purpose or other purpose that would require a conversion of the Property to commercial use, or (iv) use or permit the use of the Property for any purpose illegal under any applicable law. Owner shall take all reasonable and practical action to prevent the zoning of the Property for commercial, mixed, or illegal use (each a "**Prohibited Use**"). In the event of a Prohibited Use of the Property, an appraisal of the Property obtained under this Agreement shall include a Modification Adjustment reflecting any effect on value resulting from such Prohibited Use. Any such appraisal and Modification Adjustment shall be conducted and computed in accordance with, and subject to the terms of, Section 14 below.

**7.5** **Receiver.** Owner shall not permit the appointment of a receiver for the Property. If such a receiver is appointed, Owner shall immediately take all actions (including, without limitation, the deposit of a bond with a court having appropriate jurisdiction) necessary or appropriate to remove or terminate the receiver. If Owner fails to do so, Investor may, but is not obligated to, at Owner's expense, take such action as Investor in its sole discretion may deem necessary or appropriate to remove the receiver. All expenses (including, without limitation, Attorneys' Fees) paid shall be deemed to be Protective Advances.

**7.6** **Notice to Owner of Material Impact on Property.** Owner or Owner's representative shall immediately provide Investor with notice of any event that has or may be expected to have a material effect or impact on the Property, the value of the Property, or Investor's ability to exercise any right conferred by this Agreement, including, without limitation: (i) any failure of any condition or covenant set forth in this Agreement, the responsibility for which belongs to Owner; (ii) the death or divorce of any Owner or of any Trustee or Trustor (where Owner is/are the Trustee(s) of a Trust); (iii) the decision by any Owner

- 13 -

to no longer occupy the Property as Owner's Principal Residence or to sell (or market for sale) or transfer the Property or any interest in the Property; (iv) the discovery of any lien or adverse possessory interest in the Property not previously disclosed in writing to Investor, whether or not such interest has ripened into a recordable interest; (v) the filing of any voluntary or involuntary bankruptcy by or against any Owner or any Trustor (where Owner is/are the Trustee(s) of a Trust); (vi) any material damage or injury to the Property; (vii) Owner's receipt of any notice of condemnation; (viii) Owner's receipt of any solicited or unsolicited written offer from a third party to purchase the Property; and (ix) the occurrence of any event that Owner has knowledge of and that might have a material adverse effect on the Property, the value of the Property, Owner's interest in the Property, or Investor's rights under this Agreement.

**7.7    Asset Management Fees.**  Owner shall pay all Asset Management Fees imposed by Investor from time to time in accordance with Investor's Asset Management Fee schedule, as such schedule is amended and made available by Investor from time to time.  Asset Management Fees shall include, without limitation:  (i) fees for processing Owner requests for subordination; (ii) fees for processing Owner requests for Property title or ownership changes; (iii) fees for processing any reconveyance of Investor's interest; (iv) fees for processing Protective Advances; (v) fees relating to a Default by the Owner; and (vi) charges to cover any third party or other out-of-pocket costs relating to any of the foregoing categories (including, for example, charges imposed by title companies and escrow companies, recording of documents, and attorneys' fees).

**7.8    Cooperation with Periodic Interviews and Inspections.**  Owner shall fully cooperate with Investor's periodic telephone and/or email inquiries concerning the status of the Property and the health of the Owners and with Investor's periodic internal and external Property inspections pursuant to Section 10.3 of this Agreement (anticipated about once a year).

**7.9    Additional Information.**  Owner shall provide to Investor such reports and information available to Owner concerning the Property and any modifications to the Property as Investor may reasonably request, including by promptly completing and returning any Property questionnaire, survey or similar form that Investor provides to Owner from time to time.  If Owner fails to complete or return any such Property survey or certification within the time frame requested by Investor, Owner shall pay for any Property inspection, appraisal or other report that Investor obtains in order to collect the information that would have been provided by Owner in such requested questionnaire, survey or certification.  If Owner fails to pay any such amounts, Investor, in its sole discretion, may make such payments and any and all such payments shall be deemed to be Protective Advances.

**8.    Debt Limits and Related Obligations.**

**8.1    Limitation on Debt Associated with the Property.**

**8.1.1    Maximum Authorized Debt.**  Without Investor's express written approval, Owner shall not increase, or permit the increase of (whether through negative amortization or otherwise), the principal balance of loans secured by liens on the Property such that the aggregate principal balance of such loans (including any unused portion of any

- 14 -

committed credit line) exceeds at any time the Maximum Authorized Debt, regardless of whether or not any of such loans are Approved Pre-Existing Loans or Approved Subsequent Loans.

### 8.1.2 **Allowed Loans.**

       **i**      Prior to Investor's Notice of Option Exercise, if at any time the principal balance of all loans secured by liens on the Property is less than the Maximum Authorized Debt, Owner shall be permitted to obtain additional Approved Subsequent Loans, provided that: (1) Owner provides to Investor copies of all loan documentation (including, but not limited to, any commitment letter, offer letter or term sheet, the proposed note, the proposed deed of trust or mortgage (as appropriate), the preliminary title report, any inspections, appraisals or other Property valuations and the proposed escrow instructions) as such documentation becomes available but in no event later than three (3) Business Days prior to the proposed close of such loan, and (2) Investor has given its written consent to the proposed loan transaction, which consent will not be unreasonably withheld.

       **ii**     Investor shall be under no obligation to respond to or consent to any proposed loan transaction unless and until it has received all relevant documents and information in a timely fashion.

       **iii**    Investor's consent regarding any proposed loan to Owner will be based upon satisfaction of Investor's option underwriting standards then in effect.

       **iv**    At no time shall all principal indebtedness (whether consented to or approved by Investor or not) secured by the Property exceed in the aggregate the Maximum Authorized Debt, without the express written consent of Investor which may be withheld in Investor's sole discretion.

### 8.1.3 **Allowed Liens.** Immediately following the close of any Approved Subsequent Loan, Owner shall ensure that copies of all documents recorded as Approved Subsequent Liens against the Property are delivered to Investor.

### 8.1.4 **Prohibited Loans.** Notwithstanding anything to the contrary in this Agreement or otherwise, Owner shall not encumber the Property with any proposed loan that could materially and adversely impair Investor's Interest, as determined by Investor. Such prohibited loans include, without limitation, credit lines, "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative amortization features that could result in the principal balance of such mortgage exceeding the Maximum Authorized Debt, and mortgage loans with payment reset or other features that, in Investor's judgment, could materially affect the ability of the homeowner to meet current or future financial obligations.

### 8.1.5 **No Liability.**

       **i**      Investor shall not be liable for (including liability to repay) any loans created or obtained by Owner whether before or after delivery of a Notice of Option Exercise and whether or not consented to, approved of, or subordinated to by Investor.

- 15 -

**ii**     Investor shall not be obligated to execute any documents in connection with any loans created, obtained or refinanced by Owner, except such documents reasonably required to confirm any subordination to which Investor agrees in accordance with Section 8.2 below.

**iii**     Investor makes no representations or warranties regarding the availability or terms of any loans (including refinancing) that may be requested, obtained or held by Owner; and Investor shall have no liability whatsoever in connection with any such loans or proposed loans, including as a result of the unavailability or unfavorable terms of any such loans.

## 8.2     <u>Subordination.</u>

**8.2.1**     Except for construction loans, which are addressed in Section 8.2.2 below, Investor hereby agrees to subordinate the priority of its Option rights under each of the Transaction Documents to the lien of any lender that either refinances any Approved Pre-Existing Loan or proposes to extend to Owner any other loan secured by a lien on the Property provided that: (i) the sum of all principal indebtedness secured by the Property after giving effect to any proposed loan does not, and may not over time, exceed the Maximum Authorized Debt; (ii) all of the requirements of Section 8.1.2 above have been satisfied with respect to such loan; (iii) such loan is not determined by Investor to be prohibited under Section 8.1.4 above; (iv) any requested subordination and loan documents contain only reasonable and customary terms common to such agreements; and (v) Owner pays the Asset Management Fees associated with subordination imposed by Investor in accordance with Section 7.7 above.

**8.2.2**     Investor will subordinate its Security Interest on the Property to any lender in connection with any construction loan or other financing of any improvements to the Property if: (i) the conditions specified in Section 8.2.1 above have been met; (ii) Investor in the exercise of its reasonable discretion determines that Investor's Interest is not materially and adversely impaired; and (iii) Owner pays the Asset Management Fees associated with subordination imposed by Investor in accordance with Section 7.7 above.

**8.2.3**     Although Investor may agree to a subordination under this Section 8.2, Owner shall remain obligated to keep current in Owner's obligations secured by or incurred in connection with the Property, and shall remove all liens as required in Section 8.3 below.

## 8.3     <u>Liens and Secured Obligations.</u>

**8.3.1**     <u>Free of Liens.</u>  Owner shall at all times keep the Property free of any and all liens, encumbrances and title exceptions of any kind, except for: (i) Approved Pre-Existing Liens; (ii) Approved Subsequent Liens; and (iii) Permitted Encumbrances.

**8.3.2**     <u>Loan Payments Current.</u>  Owner shall at all times pay and keep current any and all loans and obligations secured by liens on the Property.

**8.3.3**     <u>Cure of Defaulted Loans.</u>  To the extent that: (i) there is a default under any loan or other obligation secured by a lien on the Property; or (ii) foreclosure or

- 16 -

enforcement of a lien on the Property has commenced, Owner shall take immediate action (upon or without notice or demand from Investor) necessary to: (1) terminate such foreclosure or enforcement, (2) satisfy the secured obligation, or (3) remove or release such lien from the Property.

**8.3.4** **Investor Action.** To the extent that Owner fails to take any action required under Sections 8.3.1, 8.3.2 or 8.3.3 above and Section 8.3.5 below, Investor may take such action it deems necessary to protect Investor's Interest including, without limitation, advancing funds, which shall be deemed to be Protective Advances.

**8.3.5** **Duty to Satisfy Obligations.** Notwithstanding the fact that certain liens may be Approved Pre-Existing Liens or Approved Subsequent Liens, upon exercise of the Option, Owner shall satisfy or extinguish all liens on the Property so that the entire Property (not merely Investor's Interest) is free and clear of all liens except for: (i) liens granted to or for the benefit of Investor; and (ii) Permitted Encumbrances.

**8.3.6** **No Investor Loans.** Investor shall have no authority to obtain or increase any loans from third parties that are secured by liens against the Property.

**9.** **Rights of Owner.** Subject to Investor's rights under this Agreement, Owner will enjoy the following rights with respect to the Property as long as this Agreement has not been terminated:

**9.1** **Occupancy.** Owner shall enjoy sole right of occupancy of the Property as an owner and not as a tenant or lessee, whether or not Investor has exercised the Option, subject to the following provisions of this Section 9 and subject to the rights of Owner and Investor to sell the Property pursuant to the terms of this Agreement. The foregoing sole right of occupancy shall be effective only for so long as Owner (i) does not transfer or attempt to transfer the Property except as permitted under this Agreement, and (ii) occupies the Property as provided in this Agreement. Except as contemplated by Section 9.5 of this Agreement, this right of sole occupancy is not transferable except as part of a sale of the Property permitted under this Agreement.

**9.2** **Owner Termination of the Option.**

**9.2.1** **Owner Termination Right.** Owner shall have the right, but not the obligation, to terminate the Option ("**Owner Termination**") at any time (a) by delivering written notice to Investor of the Owner Termination and (b) by paying the Owner Termination Price, as defined in Section 9.2.2 below. The Appraised Value and any Modification Adjustment to be used for purposes of computing the Owner Termination Price shall be determined pursuant to an appraisal conducted in accordance with, and subject to the terms of, Section 14 below.

**9.2.2** **Owner Termination Price.** The price to be paid to Investor for the Owner Termination ("**Owner Termination Price**") will be as set forth below:

      i      In the event that Owner provides evidence, reasonably satisfactory to Investor, that the Owner Termination Price was derived solely from the proceeds of a new or

- 17 -

refinanced loan secured by the Property, the total of the following:

**(1)** the total of:

> **(A)** the greatest of: (I) the Appraised Value of the Property at the time of the Owner Termination (or, in the case of damage, destruction or condemnation of the Property, the Appraised Value immediately prior to such damage, destruction or condemnation), (II) the Solicited Sale Value, and (III) if the Owner Termination is completed within the Initial Term of this Agreement, the Original Agreed Value;

> **(B)** minus any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

> **(C)** plus any Deferred Maintenance Adjustment;

**(2)** multiplied by the Designated Percentage;

**(3)** minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price;

**(4)** plus all monetary amounts owed to Investor as follows:

> **(A)** any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances; and

> **(B)** any unpaid Asset Management Fees.

**ii** In the event that the Owner Termination Price is not derived solely from the proceeds of a new or refinanced loan secured by the Property, the total of the following:

**(1)** the total of:

> **(A)** the greatest of: (I) the Appraised Value of the Property at the time of the Owner Termination (or, in the case of damage,

- 18 -

destruction or condemnation of the Property, the Appraised Value immediately prior to such damage, destruction or condemnation), (II) the Solicited Sale Value, (III) if the Owner Termination is completed within the Initial Term of this Agreement, the Original Agreed Value and (IV) if the Owner Termination is completed after the Initial Term of this Agreement, the Original Agreed Value times (1- Adjustment Factor);

**(B)** minus any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

**(C)** plus any Deferred Maintenance Adjustment;

**(2)** multiplied by the Designated Percentage;

**(3)** minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price; provided, however, that the Exercise Price for this Section 9.2.2(ii)(3) shall be deemed to be the Original Agreed Value times (1- Adjustment Factor) if the pricing under Section 9.2.2(ii)(1)(A), above, was determined under Section 9.2.2(ii)(1)(A)(IV);

**(4)** plus all monetary amounts owed to Investor as follows:

**(A)** any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances; and

**(B)** any unpaid Asset Management Fees.

**9.2.3** **Documents.** Prior to any Owner Termination, Owner shall provide to Investor true and correct copies of: (i) all appraisals of the Property except for appraisals obtained from Investor; (ii) all offers for the purchase of the Property, or any interest therein; (iii) all listings for the sale of the Property; and (iv) all expressions of interest to purchase the Property or any interest therein.

**9.2.4** **Non-Disclosure.** If Owner fails to disclose an offer that would form the basis for a Solicited Sale Value or Investor otherwise becomes aware of a Solicited Sale

- 19 -

Value after payment by Owner of the Owner Termination Price, Owner shall remain liable to Investor for the amount, if any, by which the price that would have been paid had the Solicited Sale Value been used in computing the Owner Termination Price exceeds the price actually paid to Investor in connection with the Owner Termination.

**9.2.5** **Owner Termination Followed by a Transfer.** If Owner terminates Investor's Interest pursuant to this Section 9.2, and within one hundred eighty (180) days from the closing of such Owner Termination, effects a disposition of the Property ("**Post-Owner Termination Disposition**"), whether by contract of sale or otherwise, under circumstances that evidence a lack of good faith and fair dealing by Owner, Investor shall be entitled to recover from Owner an amount equal to the difference between: (i) Investor's assumed proceeds calculated as if this Agreement had been in effect at the time of the Post-Owner Termination Disposition by Owner; and (ii) the amount actually paid to Investor in connection with the Owner Termination. Investor shall have the right to notify Owner in writing of Owner's liability under this Section 9.2.5, without specifying the amount of such liability, for a period of ninety (90) days following the Post-Owner Termination Disposition. Any dispute concerning Owner's liability for and Investor's right to recover any amount under this Section 9.2 will be determined by arbitration or litigation as with any other dispute under this Agreement. However, Owner shall incur no liability, and no arbitration or litigation may be commenced, if Investor fails to give the specified notice within the specified time.

**9.3** **Tax Benefits.** Investor shall not be entitled to claim any tax benefits of Property ownership unless and until exercise of the Option. Accordingly, subject to the disclaimer in Section 3.5 above, Owner may be entitled to claim all tax benefits and burdens associated with or related to the Property, all in accordance with applicable law; provided, however, that Owner shall not be entitled to any tax benefits arising out of or attributable to any unreimbursed Protective Advance.

**9.4** **Right to Proceeds.** Owner and Investor both will have the right to receive insurance and condemnation proceeds, as provided in Sections 15 and 16 below.

**9.5** **Limitation on Owner's Rights.** Except as expressly permitted in Sections 11 and 25.1.2 below, Owner shall not sell, subdivide, rent or transfer any interest in or portion of the Property absent the prior written consent of Investor. In connection with any such transfer, Owner shall pay the Asset Management Fees imposed by Investor in accordance with Section 7.7 above. If Owner has a spouse or Registered Domestic Partner who is not on record title to the Property, Owner shall not permit that Person (A) to make any payment to improve or maintain the Property, or (B) to make any payment on any obligation that is secured by the Property or on any taxes or assessments against the Property.

**9.6** **Property Modifications.** Owner shall have the right at Owner's sole expense to make modifications to the Property without first seeking prior written consent of Investor, provided that such modifications do not violate any provision of this Agreement and are performed in compliance with all applicable state, federal and local statutes, regulations and ordinances, including but not limited to, all appropriate licensing and permitting requirements.

- 20 -

**9.6.1  Ordinary and Necessary Maintenance.** Pursuant to Section 7, above, Owner shall be fully responsible for all maintenance and repair to Property. Ordinary and necessary maintenance and repairs on or to the Property are those that maintain the condition and value of the Property in its general condition at the time that this Agreement is entered into; these costs and related expenses are necessary to keep the Property in an efficient operating condition, as more particularly outlined in U.S. Treasury Regulation 1.162-4 (as amended from time to time), and are not to be considered modifications eligible for any adjustment. By way of example and not limitation, replacing a roof, upgrading to energy-efficient windows or appliances (including HVAC units), adding built-in furniture or repaving a driveway shall be considered ordinary maintenance and repair and not improvements.

**9.6.2  Notice by Owner to Investor and Appraisal.** Not less than forty five (45) days prior to the closing of any Ultimate Sale by Owner or by Investor, or at such time as Owner initiates an Owner Termination of the Option (whichever is earlier), Owner shall coordinate with Investor to obtain an appraisal of the Property in order to determine the amount of any Modification Adjustment. Such appraisal shall be conducted in accordance with, and subject to the terms of, Section 14 below.

**10.  Rights of Investor.**

**10.1  Right to Protect Investor's Interest.** To the extent that Owner fails to take action to comply with Owner's obligations under this Agreement, Investor shall have the right to take such action and pay such money as Investor deems appropriate to protect the Property and Investor's Interest and to correct Owner's failure. Except as provided below, Investor shall give Owner written notice of Owner's failure prior to Investor taking corrective action. If Owner fails to take appropriate corrective action within ten (10) days of such notice, Investor may take action. However, prior written notice of the failure shall not be required if: (i) the terms of this Agreement expressly state that prior notice or demand is not required; or (ii) Investor, in the exercise of its reasonable discretion, determines that prompt action is necessary in order to protect the Property and Investor's Interest. Any amounts advanced by Investor in connection with such action (including, without limitation, Attorneys' Fees incurred in litigation or arbitration with parties other than Owner) shall be deemed to be "**Protective Advances.**" Notwithstanding Investor's actions, unless all Protective Advances (and all related fees and charges) are paid in full by Owner, Owner shall be deemed in continuous breach of Owner's covenants pursuant to Section 2.4.3 of this Agreement.

**10.2  Reimbursement; Interest.** Owner shall promptly, upon Investor's demand for payment, but not later than ten (10) days after demand, pay or reimburse Investor for any and all Protective Advances, including, without limitation, those related to: the placement of insurance, the payment of taxes, the making of any necessary repairs, or the cure of defaulted loans. Such Protective Advances shall bear interest at the rate of one and one-half percent (1-1/2%) per month or, if prohibited, at the highest permissible legal rate from the date of demand until paid in full.

**10.3  Inspections.** Owner agrees that Investor or its agents may, upon the giving of reasonable advance notice, make reasonable inspections of both the interior and exterior of the Property, and Owner agrees to cooperate in setting the time and allowing entry for

any such inspection.  If Investor is not permitted to inspect the Property thoroughly as a result of the actions or inactions of Owner, there shall arise a rebuttable presumption that Owner has failed to maintain and repair the Property as required under Section 7.1 above.

## 11. **Ultimate Sale of the Property By Owner.**

### 11.1 **Sale by Owner**

**11.1.1 Solicitation.**  At any time, Owner is permitted to solicit offers for the sale of the Property without the express approval of Investor.

**11.1.2 Restriction.**  Owner may not sell or otherwise transfer the Property, or any portion of Owner's interest in the Property, as part of an Ultimate Sale that is not a Permitted Sale under this Section 11; and Investor shall not be obligated to:  (i) consent to any Ultimate Sale or other transfer of the Property, or any interest in the Property, that is not in accordance with this Section 11; (ii) release, assign or terminate any of the Transaction Documents in connection with an Ultimate Sale unless it is a Permitted Sale; or (iii) release Owner from any duty or liability under the Transaction Documents except in connection with a sale to which it consents.

**11.1.3 Prejudice to Investor.**  Any attempted sale (except for a Permitted Sale) or other transfer of the Property, or any portion of Owner's interest in the Property, that does not comply with this Section 11 shall be deemed to prejudice Investor's Interest.

### 11.2 **General Requirements.**

**11.2.1 Arm's Length.**  Absent the specific waiver of Investor, all Ultimate Sales or other transfers by Owner must be arm's length, made on commercially reasonable terms and entered into in good faith.

**11.2.2 Responsibility For Liens.**  In connection with any such sale, Owner shall be solely responsible for satisfying any and all loans and other obligations secured by liens on the Property (other than Permitted Encumbrances) and removing all such liens either through escrow from amounts that are owed to Owner or, if such amounts are insufficient, from Owner's other assets.

**11.2.3 Sales Commissions.**  All Sales Commissions will be paid by Owner either through escrow from amounts that are owed to Owner or, if such amounts are insufficient or commissions are settled outside of escrow, from Owner's other assets.

**11.2.4 Appraisal.**  In connection with any Ultimate Sale of the Property by Owner, Owner shall cooperate with Investor in obtaining an appraisal of the Property.  Such appraisal (including any Modification Adjustment) shall be conducted in accordance with, and subject to the terms of, Section 14 below.

**11.2.5 Closing Costs.**  Unless otherwise provided in this Agreement or otherwise agreed to by a third party payor, all Closing Costs relating to any such sale shall be

- 22 -

paid by Owner either from amounts that are owed to Owner or, if such amounts are insufficient, from Owner's other assets.

**11.2.6 Closing.** Closing of an Ultimate Sale by Owner will be scheduled so as to allow Investor an opportunity: (i) to exercise the Right of First Refusal pursuant to Section 11.7; (ii) to review relevant documents for any Modification Adjustment and any Deferred Maintenance Adjustment; and (iii) to conduct the appraisals referred to in Section 11.2.4 above and Section 14 below.

**11.3    Notice of Sale.** Owner will notify Investor in writing of Owner's decision to market or offer the Property for sale as promptly as practicable following such decision, but in no event less than forty-five (45) days prior to the closing of any such sale. If Owner has already engaged a real estate professional or otherwise entered into any agreement in connection with the sale or other transfer of the Property, all documents (including but not limited to any inspection report, listing agreement, staging agreement and preliminary escrow instructions, and all related documents) shall be transmitted to Investor as attachments to Owner's notice.

**11.3.1** Within five (5) Business Days following Owner's delivery to Investor of notice of Owner's intention to sell, Investor: (i) may provide to Owner a list of suggested real estate professionals with whom Investor has negotiated certain concessions (which may include commission reductions); and (ii) will provide to Owner a proposed date for a home inspection, which home inspection shall be performed for the purpose of ascertaining the condition of the Property. Notwithstanding any home inspection or disclosure performed pursuant to state law, Investor reserves the right to order a further home inspection if Investor, in its sole discretion, determines that a further home inspection is necessary or appropriate. Any home inspection performed pursuant to this Section 11.3.1 shall be at Owner's expense.

**11.3.2** If, as a result of the home inspection described in Section 11.3.1 above or any other inspection or appraisal performed in connection with any of the computations to be made under this Agreement or any of the other Transaction Documents, Investor determines in its reasonable discretion that Owner has breached his, her or its duties of maintaining and/or repairing the Property, as set forth in Section 7.1 above, Investor will have the right to make a commercially reasonable estimate of the dollar amount of such deferred maintenance and promptly notify Owner of Investor's determination. This dollar amount shall be the "**Deferred Maintenance Adjustment.**"

**11.4    Owner's Obligations During the Sale Process.** Owner shall promptly provide to Investor all of the following as they are received by Owner: (i) copies of all offers to purchase the Property; (ii) copies of all contracts and other documents related to a prospective sale (including but not limited to inspections, appraisals, seller financing documents, etc.); and (iii) all escrow instructions, preliminary title reports and other documents and instruments of whatever character relating to the proposed sale or transfer.

**11.4.1** Any sales contract or deposit agreement with an Ultimate Buyer must provide that it is subject to the Option and to this Agreement and that no sale can be completed other than in accordance with the terms of this Section 11.

- 23 -

**11.4.2** Any sale or other transfer of the Property must be consummated through an appropriate real property escrow account and may only be consummated with Investor's written consent to the final escrow instructions, which consent will not be unreasonably withheld but will be conditioned upon compliance with the terms and conditions of this Agreement.

**11.5** **Special Provisions Relating to "Sale By Owner" Transactions.** In the case of any Ultimate Sale that constitutes a "sale by owner" transaction, if Investor determines that a proposed sale price differs materially from the Appraised Value of the Property determined pursuant to an appraisal conducted in accordance with Section 14 below, Investor reserves the right to insist that such Appraised Value, rather than the sales price, be used to calculate Investor's portion of the sales proceeds.

**11.6** **Investor Portion of Sales Proceeds.** At close of and through escrow for the Ultimate Sale, Investor shall be paid, as consideration for Investor's Interest (and the transfer, assignment or release of Investor's Interest), the total of the amounts set forth below:

    **i**    the total of the following:

        **(1)**    the Effective Sales Price;

        **(2)**    minus any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

        **(3)**    plus any Deferred Maintenance Adjustment;

    **ii**    multiplied by the Designated Percentage;

    **iii**    minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price;

    **iv**    plus all monetary amounts owed to Investor as follows:

        **(1)**    any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances; and

        **(2)**    any unpaid Asset Management Fees.

**11.7** **Investor Right of First Refusal.** Investor shall have a limited Right of First Refusal to purchase the Property on economic terms identical to those that Owner has indicated he, she or it is willing to accept for the sale of the Property.

**11.7.1 Exercise of Right.**

- 24 -

**i**     At such time as Owner receives a written bona fide offer for an Ultimate Sale that Owner is willing to accept, Owner shall refrain from accepting such offer and shall immediately provide written notice to Investor in the form attached to this Agreement as <u>Exhibit D</u>. This notice shall be accompanied by a copy of the written offer and all attachments.

**ii**     Thereafter, Investor shall have until the close of business on the third (3rd) Business Day following Investor's actual receipt of such notice (together with a copy of the written offer) to notify Owner or Owner's agent of Investor's decision to purchase the Property on economic terms and within all specified time periods identical to those that Owner has indicated he, she or it is willing to accept.

**iii**     If the price of a bona fide written offer previously delivered to Investor is materially reduced after delivery to Investor, Owner shall promptly inform Investor in writing of such reduced price and Investor shall have until the close of the third (3rd) Business Day following Investor's actual receipt of such notice of reduced price to notify Owner or Owner's agent in writing of Investor's decision to purchase the Property on economic terms (including the reduced price) identical to the revised terms that Owner has indicated he, she or it is willing to accept.

**iv**     Investor's failure to respond to Owner within the time set forth in this Section 11.7 shall constitute Investor's waiver of its Right of First Refusal.

**v**     Any deposit(s) related to the sale shall be in the amounts and subject to the conditions specified in the offer.

**vi**     The closing of the sale to Investor shall occur not later than the date specified for the closing of the proposed Ultimate Sale to the third party.

**11.7.2  <u>Calculation of Sales Proceeds Payable to Owner.</u>**     Should Investor elect to exercise its Right of First Refusal, at close of escrow Investor will pay to or for the benefit of Owner, as consideration for all of Owner's right and title to, and interest in, the Property, the total of the amounts set forth below:

**i**     the amount of the bona fide offer received by Owner;

**ii**     minus the amount Investor would have received under Section 11.6 above if the proposed Ultimate Sale to the third party had been consummated on the terms offered;

**iii**     minus all amounts payable under Sections 11.7.3 and 11.7.4 below.

**11.7.3  <u>Unpaid Loans.</u>**     To the extent that there are any outstanding loans or other liquidated obligations secured by liens on the Property (other than Permitted Encumbrances), Owner and Investor agree, and Investor is hereby irrevocably authorized and directed, to disburse through escrow from the amounts that are owed to Owner, all amounts necessary to satisfy such loans or liquidated obligations in full. If such amounts are not

- 25 -

sufficient to satisfy such loans and other liquidated obligations, Owner shall satisfy them with Owner's separate funds.

**11.7.4 Other Expenses.** To the extent there are any Sales Commissions, Closing Costs, Appraisal Expenses or any other outstanding amounts that are the obligation of Owner and payment of which must be made to permit closing of the sale of the Property to Investor, Owner and Investor agree, and Investor is hereby irrevocably authorized and directed, to disburse through escrow from the amounts that are owed to Owner, all amounts necessary to satisfy such obligations in full. If such amounts are not sufficient to satisfy such obligations, Owner shall satisfy them with Owner's separate funds.

**11.8 Effect of Option at Closing.** With respect to any contract of sale for an Ultimate Sale permitted under this Agreement (if Investor does not exercise its Right of First Refusal), Investor shall have the sole right to decide (so long as title to one hundred percent (100%) of the Property is acquired by the Ultimate Buyer in accordance with the terms of the Ultimate Sale) whether Investor will: (i) exercise the Option, by purchasing the Designated Percentage of the Property from Owner and transferring title to the Ultimate Buyer; (ii) sell and assign the Option to the Ultimate Buyer; or (iii) terminate and release the Option, this Agreement, and the Recorded Memorandum and reconvey the Security Instrument.

## 12. Ultimate Sale of Property By Investor.

**12.1 Rights in Property.** Pursuant to this Agreement, Investor has a contingent ownership interest in the Property, which is protected in part by this Agreement, the Recorded Memorandum and the Security Instrument.

**12.2 Sale by Investor after Exercise of Option.** The Option gives Investor the right to purchase the Designated Percentage and become a co-owner of the Property under certain circumstances. In many cases, Investor's exercise of its Option will be done in connection with the sale of the Property by Owner. However, Investor may also exercise its Option under the scenarios set forth in Section 2.4.2 of this Agreement (any time after a date that is six (6) months prior to the Expiration Date, up to and including the Expiration Date) and Section 2.4.3 of this Agreement (which includes instances in which Owner fails to protect or jeopardizes Investor's Interest). If Investor exercises its Option or anticipates doing so pursuant to Section 2.4.2 or Section 2.4.3 of this Agreement, Investor, as a then or future co-owner of the Property, shall then have the right to solicit and to sell the entire Property to one or more third parties in an Ultimate Sale or to Owner upon Owner's exercise of Owner's Right of First Refusal on the terms and conditions set forth below.

**12.3 Owner Cooperation.** In connection with a sale under the foregoing Section 12.2, Owner, at Owner's expense, shall reasonably cooperate with Investor's efforts in any advertising, solicitation and sale and will take such action as is reasonably requested by Investor including, without limitation, the following: (i) permitting reasonable access to the Property to Investor, any prospective buyer, and their brokers and agents; and (ii) promptly executing all documents reasonably presented to Owner by Investor to effect a transfer of Owner's interest in the Property to the Ultimate Buyer.

- 26 -

**12.4** _Special Power of Attorney Coupled with an Interest._ **Each Person whose signature appears below as Owner hereby irrevocably nominates, constitutes and appoints, in general, Investor and its successors and assignees, and, in particular, each of its and their Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Managing Directors and Vice Presidents, as Owner's true and lawful agents and attorneys-in-fact (with full power of substitution) in Owner's name and on Owner's behalf (in any and all capacities) to exercise the powers set forth below consistent with the provisions contained in this Agreement ("Power of Attorney").**

This Power of Attorney will be exercised: (i) _only_ _when_ Investor or its successor or assignee exercises or anticipates exercising the Option pursuant to either Section 2.4.2 of this Agreement (up to six (6) months prior to the Expiration Date) or Section 2.4.3 of this Agreement (which includes instances in which Owner fails to protect or jeopardizes Investor's Interest) and becomes or anticipates becoming a co-owner of the Property; and (ii) _only_ _for_ the sole purpose of authorizing and empowering Investor (although only a co-owner or possible future co-owner of the Property) to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein.

Accordingly, Investor or its successor or assignee and the other parties designated above as attorneys-in-fact, shall have the power and authority to do all acts and to execute any and all documents, instruments and agreements as such agents and attorneys-in-fact deem necessary or advisable:

      1.      to solicit buyers for the entire Property and offers for a sale of the entire Property;

      2.      to advertise the entire Property for sale on reasonable and customary terms and conditions for a price that is reasonable in view of the then market conditions; and

      3.      to sell the entire Property and transfer Owner's entire interest in, and title to, the Property on usual and customary terms and conditions, the proceeds of which will be allocated to Owner and Investor as provided in this Agreement.

The Power of Attorney granted hereunder is coupled with an interest. All acts that the attorneys-in-fact shall lawfully do, or cause to be done, under the authority of this Power of Attorney are hereby expressly approved, ratified and confirmed.

This Power of Attorney is a durable power of attorney and shall remain in force despite any Owner's subsequent incapacity, disability or death.

Owner and Investor agree that if Investor is not allowed to exercise its rights under this Section 12, or if Owner fails to comply with its obligations under this Section 12, the damages to Investor would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to it in law, equity or otherwise, Investor shall be entitled to specific performance of the provisions of this Section 12.

- 27 -

This Power of Attorney shall remain in full force and effect until such time as this Agreement terminates or is terminated, notwithstanding any change or changes to this Agreement. Owner hereby ratifies and affirms all that such attorney-in-fact, or any substitute or substitutes, may do by virtue of the power conveyed hereby. **THIS POWER OF ATTORNEY SHALL TERMINATE WHEN THIS AGREEMENT TERMINATES OR IS TERMINATED.**

To implement the terms of this Section 12.4 for the purposes of the real property records, Owner is concurrently executing a notarized power of attorney as part of the Recorded Memorandum, which will reflect the Power of Attorney described above. From time to time in the future as long as this Agreement has not, or is not, terminated, Owner shall, at Investor's request, execute such additional powers of attorney as Investor may deem necessary identifying such other Investor officers as Owner's attorneys-in-fact as Investor deems reasonably necessary for purposes of this Section 12.4.

### 12.5    General Requirements.

   **12.5.1 Arm's Length.** All Ultimate Sales or other transfers by Investor must be arm's length, made on commercially reasonable terms, and entered into in good faith.

   **12.5.2 Responsibility for Liens.** In connection with any such sale, Owner shall be solely responsible for satisfying any and all loans and other obligations secured by liens on the Property except for Permitted Encumbrances and removing all such liens either through escrow from amounts that are owed to Owner or, if such amounts are insufficient, from Owner's other assets.

   **12.5.3 Sales Commissions.** All Sales Commissions will be paid by Owner either through escrow from amounts that are owed to Owner or, if such amounts are insufficient or commissions are settled outside of escrow, from Owner's other assets.

   **12.5.4 Appraisals.** Investor will obtain an appraisal in connection with any exercise of the Option by Investor as described in Section 12.2 above and subsequent Ultimate Sale of the Property by Investor. Such appraisal (including all payments therefor and any Modification Adjustment) shall be made and conducted in accordance with, and subject to the terms of, Section 14, below.

   **12.5.5 Closing Costs.** Unless otherwise provided in this Agreement, all Closing Costs relating to any such sale shall be paid by Owner either from amounts that are owed to Owner or, if such amounts are insufficient, from Owner's other assets.

   **12.5.6 Closing Date.** Closing of an Ultimate Sale by Investor will be scheduled so as to allow Owner an opportunity: (i) to exercise the Right of First Refusal pursuant to Section 12.7; and (ii) to identify any material capital modifications pursuant to Section 9.6.

**12.6   Notice.**

   **12.6.1** If Investor chooses to initiate an Ultimate Sale, Investor shall provide Owner (or Owner's executor) with ten (10) days' advance notice of Investor's intention to solicit buyers and sell the Property.

   **12.6.2** Copies of all written offers for purchase of the Property will be promptly provided to Owner (or Owner's executor) together with all other terms of a proposed sale.

   **12.6.3** To the extent that any liens (other than Permitted Encumbrances) remain on the Property, Investor may direct proceeds from the Ultimate Sale, which would otherwise be allocable to Owner, to satisfy such liens on behalf of Owner.

   **12.7   Owner Right of First Refusal.** Owner shall have a limited Right of First Refusal to purchase the Property on economic terms identical to those that Investor has indicated it is willing to accept for the sale of the Property.

**12.7.1   Exercise of Right of First Refusal.**

   **i**      At such time as Investor receives a written bona fide offer for an Ultimate Sale that Investor is willing to accept, Investor shall refrain from accepting such offer and shall immediately provide written notice to Owner (or Owner's executor) in the form attached to this Agreement as Exhibit E. This notice shall be accompanied by a copy of the written offer and all attachments.

   **ii**     Thereafter, Owner (or Owner's executor) shall have until the close of business on the third (3rd) Business Day following Owner's (or Owner's executor's) actual receipt of such notice (together with a copy of the written offer) to notify Investor or Investor's agent of Owner's (or Owner's executor's) decision to purchase the Property on economic terms and within all specified time periods identical to those that Investor has indicated it is willing to accept.

   **iii**    If the price of a bona fide written offer previously delivered to Owner is materially reduced after delivery to Owner, Investor shall promptly inform Owner in writing of such reduced price and Owner shall have until the close of the third (3rd) Business Day), following Owner's actual receipt of such notice of reduced price to notify Investor or Investor's agent in writing of Owner's decision to purchase the Property on economic terms (including the reduced price) identical to the revised terms that Investor has indicated it is willing to accept.

   **iv**     Owner's (or Owner's executor's) failure to respond to Investor within the time set forth in this Section 12.7 shall constitute Owner's (or Owner's executor's) waiver of its Right of First Refusal.

   **v**      Any deposit(s) related to the sale shall be in the amounts and subject to the conditions specified in the offer.

- 29 -

   **vi**  The closing of the sale to Owner shall occur not later than the date specified for the closing of the proposed Ultimate Sale to the third party.

   **vii**  Owner shall pay any and all Closing Costs and Sales Commissions incurred by Investor in connection with the sale to Owner and the proposed Ultimate Sale to the third party.

  **12.7.2 Unpaid Loans.** If there are any outstanding loans secured by liens on the Property, Owner may choose to accept the Property subject to such liens rather than satisfying the loans and removing the liens through escrow.

  **12.7.3 Termination of Option.** If Owner exercises its Right of First Refusal, the Option shall terminate as provided in Section 2.7.1 of this Agreement.

  **12.8**  **Amounts Paid Through Escrow.**

  **12.8.1 Investor Portion of Sales Proceeds.** At close of, and through, escrow for the Ultimate Sale or if Owner exercises Owner's Right of First Refusal under Section 12.7 of this Agreement, Investor shall be paid, as consideration for Investor's Interest (and the transfer, assignment or release of Investor's Interest) the total of the amounts set forth below:

   **i**  the total of the following amounts:

    **(1)**  the Effective Sales Price;

    **(2)**  minus any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

    **(3)**  plus any Deferred Maintenance Adjustment;

   **ii**  multiplied by the Designated Percentage;

   **iii**  plus all monetary amounts owed to Investor as follows:

    **(1)**  any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances; and

    **(2)**  any unpaid Asset Management Fees;

   **iv**  plus any Closing Costs pre-paid by Investor.

  **12.8.2 Unpaid Obligations.** To the extent that there are any outstanding loans secured by liens on the Property, any unpaid Sales Commissions, any unpaid Closing Costs, and any Appraisal Expenses for which Owner is liable (demand for which has been submitted into escrow), Investor is hereby irrevocably authorized and directed to disburse

- 30 -

through escrow from the amounts that are allocable to Owner, all amounts necessary to satisfy such obligations in full. If such amounts are not sufficient to satisfy such loans and other liquidated obligations, Owner shall satisfy them with Owner's separate funds.

**12.9  Owner Portion of Sales Proceeds.** At the close of escrow of the Ultimate Sale, Owner shall be paid as consideration for Owner's interest in the Property the balance of the sales proceeds following payment of the amounts specified in Sections 12.5 and 12.8 above.

**13.  Waiver of Right to Partition. Owner and Investor agree and acknowledge that neither shall have the right to partition the Property or to seek such a partition prior to the Termination Date. Owner and Investor each hereby waive and relinquish all rights either of them may now or hereafter have to seek partition of the Property prior to the Termination Date, whether in kind or by sale. Owner and Investor each hereby acknowledge and agree that this waiver bars them, both individually and collectively, from commencing or continuing any action for partition and constitutes a valid waiver of the right to partition prior to the Termination Date.**

**14.  Appraisal Procedures.** The procedures set forth in this Section 14 shall control all appraisals of the Property obtained by either party pursuant to this Agreement.

**14.1  Appraiser.** All appraisals shall be conducted by an appraiser approved in advance by Investor and unaffiliated with either Investor or Owner.

**14.2  Appraisal.** Any appraisal required or otherwise obtained under this Agreement must conform to Investor's then-current appraisal requirements. Either party may obtain an appraisal of the Property at any time upon reasonable notice to the other party. Owner and Investor shall reasonably cooperate at their own expense with the appraiser in the appraisal of the Property. A copy of the appraisal shall be promptly delivered by the obtaining party to the other party upon completion.

**14.3  Appraisal Review.** If, upon review of an appraisal, either party concludes that the appraisal contains a material omission or material error of fact, such party may, within ten (10) days after receipt of the appraisal, request a reconsideration of the appraisal, at its own cost, upon reasonable notice to the other party. A copy of the reconsideration shall be promptly delivered by the requesting party to the other party upon completion.

**14.4  Appraised Value.** The Appraised Value of the Property, or of the Modification Adjustment as determined in accordance with Section 14.4.1 below, shall be the value reflected on the appraisal (or any reconsideration of the appraisal) conducted pursuant to this Section 14; provided, that, if Investor and Owner are unable to agree in good faith on the Appraised Value and/or the Modification Adjustment reflected on any such appraisal, the issue will be determined by arbitration before a single neutral arbitrator. The arbitration will be administered by the Judicial Arbitration and Mediation Service (or "**JAMS**") or its successor pursuant to its Streamlined Arbitration Rules and Procedures (or successor procedures) and occur as close to the location of the Property as reasonably possible. The arbitration fees (including the fees of the arbitrator) shall be shared equally by Investor and Owner. Investor and Owner shall each pay their own Attorneys' Fees.

- 31 -

**14.4.1 Modification Adjustment.** In the event of a Prohibited Use (as described under Section 7.4 above), the appraiser will be instructed to determine two fair market values for the Property, the first based upon its actual condition ("**Actual Value**") and the second based upon the hypothetical absence of the Prohibited Use ("**Hypothetical Value**"). The difference between the two values (the Actual Value minus the Hypothetical Value) shall be the "**Modification Adjustment**." If the Actual Value of the Property is more than the Hypothetical Value, the Modification Adjustment will be a positive number. If the Hypothetical Value of the Property is more than the Actual Value, the Modification Adjustment will be a negative number.

**14.4.2 Cooperation.** Owner will cooperate with the appraiser by granting full access to the Property and by making available relevant documentation with respect to the appraisal, including but not limited to any documents that Owner may have concerning any modification or Prohibited Use of the Property.

**14.5 Payment of Appraisal Expenses.** Owner shall pay all Appraisal Expenses associated with the first appraisal (which shall include a Modification Adjustment, if appropriate) obtained in connection with: (i) any Owner Termination pursuant to Section 9.2; (ii) any Ultimate Sale by Owner pursuant to Section 11; (iii) any exercise of the Option including in conjunction with an Ultimate Sale by Investor pursuant to Section 12; (iv) any allocation of insurance proceeds pursuant to Section 15.2; and (v) any determination of Liquidated Damages pursuant to Section 19.4 or the Security Instrument. In all other cases, including in the case of a second appraisal obtained in connection with any of the foregoing events, the Appraisal Expenses shall be paid by the party who obtained or requested the appraisal. If the Appraisal Expenses have not been paid by the party who is required to bear the Appraisal Expense, the other party may subtract the Appraisal expenses, or direct the payment of the Appraisal Expenses out of escrow, from the funds that would otherwise be due to the party who is liable for the Appraisal Expenses. Each party is entitled to receive a copy of any appraisal paid for and/or received by the other party.

## 15. Property Destruction or Damage; Insurance.

**15.1 Repair and Restoration.** Except to the extent Owner is required to take other action in connection with Senior Liens on the Property, the following provisions shall apply in cases where any loss occurs in connection with the Property, and restoration or repair is economically feasible. Insurance proceeds (whether the underlying insurance is required by Investor or not), other than amounts applied to Senior Loans, shall be applied in such cases as set forth below.

**15.1.1** If the Property is destroyed or damaged in any material manner, any and all insurance proceeds shall be applied to restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage; provided that Investor shall have the right to prior review of any restoration or repair plans and to determine, in good faith and in the exercise of its reasonable discretion: (i) whether the restoration or repair plans are economically feasible; and (ii) if not, to disapprove such restoration or repair plans.

**15.1.2** During any repair or restoration, in order to ensure that the work is performed to Investor's satisfaction, Investor shall have the right to hold any and all insurance proceeds and release such funds to the Person or Persons performing the repair and restoration work in one or more progress payments as the work is completed. Unless applicable law requires interest to be paid on such insurance proceeds or a written agreement to that effect is made by the parties, Investor shall not be required to pay Owner any interest or earnings on such proceeds.

**15.1.3** If the Property is repaired, it must be restored to at least the same condition and characteristics as of the time immediately preceding such destruction or damage; and, in any event, no less favorable a condition than set forth in Section 7.1 above, regardless of whether the insurance proceeds are sufficient to accomplish such repair. Investor shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property, even if the insurance proceeds are insufficient to complete the restoration or repair.

**15.2  Allocation Where Repair Not Feasible.** If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, Owner shall obtain an appraisal in accordance with, and subject to the terms of, Section 14 above, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage.

**15.2.1** Any and all insurance proceeds, whether or not the underlying insurance was required by Investor, will be allocated in the following order:

**i**      to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting with the insurers the payments under the relevant insurance policies;

**ii**     to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens;

**iii**    to Investor, an amount equal to any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances, plus any unpaid Asset Management Fees;

**iv**     to Investor, an amount equal to the total of the following:

**(1)**    the Appraised Value of the Property immediately prior to the destruction or damage;

**(2)**    multiplied by the Designated Percentage;

**(3)**    minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price; and

- 33 -

**v**   to Owner, the balance of the proceeds.

**15.2.2** If (a) Owner fails to maintain insurance in amounts required by Investor pursuant to Section 7.2 above, or any insurance claim is denied due to Owner's action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to Investor the entire amount owed as set forth in Section 15.2.1 above, the provisions of this Section 15.2.2 shall control. In this case, Investor may exercise the Option (if it has not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 12 above subject to the following provisions.

**i**   To exercise the Option in this situation Investor shall be permitted to pay $1.00 instead of the Remaining Portion of the Exercise Price. This reduced payment is permitted only if Owner has failed to maintain the required insurance (or the insurance claim is denied due to action or inaction of Owner) and because of the added economic burden and risk imposed on Investor by virtue of Owner's failure. The reduction in the price paid by Investor to exercise the Option will be taken into account as provided in Section 15.2.2.ii below.

**ii**   Notwithstanding the provisions of Section 12.8.1 above, the proceeds of any sale pursuant to Section 15.2.2 above, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by Investor), will be allocated in the following order:

**(1)**   to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting with the insurers the payments under the relevant insurance policies;

**(2)**   to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, payment shall result in the discharge of the related Senior Liens;

**(3)**   to Investor, an amount equal to any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances, plus any unpaid Asset Management Fees;

**(4)**   to Investor, an amount equal to the total of the following:

**(A)**   the Appraised Value of the Property immediately prior to the destruction or damage;

- 34 -

**(B)** multiplied by the Designated Percentage;

**(C)** minus, the Remaining Portion of the Exercise Price (even though Investor will have already exercised the Option in accordance with Section 12.2 above); and

**(5)** to Owner, the balance of the proceeds.

## 16.  Condemnation.

**16.1    Total Condemnation.**  If the Property is condemned, in whole, all condemnation proceeds net of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated in the following order:

**16.1.1** to payment of all Senior Loans, provided that, if the Net Condemnation Proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens:

**16.1.2** to Investor, an amount equal to the total of the following:

**i** the Net Condemnation Proceeds;

**ii** multiplied by the Designated Percentage;

**iii** minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price;

**16.1.3** to Investor, an amount equal to the total of the following:

**i** any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such unreimbursed Protective Advances; and

**ii** plus any unpaid Asset Management Fees;

**16.1.4** to Owner, the balance of the proceeds, if any.

**16.2    Partial Condemnation – Option Exercised.**  If the Property is condemned in part, and if the Option has been exercised, all Net Condemnation Proceeds will be allocated as provided in Section 16.1 above.

**16.3    Partial Condemnation – Option Unexercised.**  If the Property is condemned in part, and if the Option has not been exercised, the following provisions shall apply:

- 35 -

Case 22-12465-TWD    Claim 16-1 Filed 05/02/27/05/05/22 Attachment Pg. Page 79 of 77

**16.3.1** The Net Condemnation Proceeds will be used, first, to pay all Senior Loans, provided that, if the Net Condemnation Proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens;

**16.3.2** For all remaining calculations to be done under this Agreement and the other Transaction Documents, the Remaining Portion of the Exercise Price shall be reduced by the following amount (the "**Investor Condemnation Credit**"):

      **i**      the Net Condemnation Proceeds;

      **ii**     multiplied by the Designated Percentage.

**16.3.3** In addition, if the Investor Condemnation Credit equals or exceeds fifty percent (50%) of the original Remaining Portion of the Exercise Price, Investor shall have the immediate right (but not the obligation) to exercise the Option, by paying the Remaining Portion of the Exercise Price reduced by the Investor Condemnation Credit.

**16.3.4** If Investor exercises the Option as permitted under Section 16.3.3 above, Investor shall be entitled to receive its portion of the Net Condemnation Proceeds as provided in Section 16.1 above, minus the amount of the Investor Condemnation Credit.

**16.3.5** After distribution of the Net Condemnation Proceeds in accordance with Sections 16.3.1 through 16.3.4 above, the remaining proceeds will be distributed as follows:

      **i**      First, to Investor, an amount equal to the total of (A) any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such unreimbursed Protective Advances, plus (B) any unpaid Asset Management Fees;

      **ii**     Second, to Owner for the balance of the proceeds.

**16.4**   **Reservation of Rights.** In the case of a partial condemnation, Investor shall retain its Designated Percentage with respect to any Property that has not been condemned.

**17.**   **Environmental Matters.**

**17.1**   **Environmental Prohibitions.** As provided in Section 7.1 above, Owner shall not, and shall not allow others to, violate any laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any state, federal or local law or regulation, including, without limitation, those governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge or disposal (whether accidental or intentional) of any toxic or hazardous substances, materials or wastes, including, but not limited to, Hazardous Materials. "**Hazardous Materials**" as used in this Agreement means any: (i) hydrocarbons; (ii) asbestos; and (iii) any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, renders it subject to state, federal or local

- 36 -

regulation, investigation, remediation or removal as potentially injurious to the environment, animals or the public health or welfare.

**17.2 Environmental Representations.** Owner represents and warrants to Investor as of the Effective Date, Owner has no knowledge of or information concerning any violation of, or claim of violation of, laws or regulations relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge or disposal (whether accidental or intentional) of any toxic or hazardous substances, materials or wastes, including, but not limited to, Hazardous Materials. In addition, Owner has no knowledge of the presence of any Hazardous Materials on, in, or about the Property or property in the vicinity of the Property.

**17.3 Environmental Indemnity.** Owner hereby agrees to indemnify and hold Investor harmless from and against any and all claims, damages, liabilities, actions and expenses (including, without limitation, Attorneys' Fees) of every kind arising out of or relating to: (i) breach of the foregoing covenants, representations and warranties; or (ii) the presence of any Hazardous Materials on, in or about the Property or in the vicinity of the Property.

**18. Events of Default.** The occurrence of any of the following shall constitute a "**Default**" under this Agreement:

**18.1 Failure to Perform.** Owner (i) fails to perform any obligation or covenant or fails to comply with any requirement under this Agreement, including but not limited to (1) any failure to make any payment owed to Investor under this Agreement, (2) any failure to honor Investor's Right of First Refusal, or (3) any failure to cooperate or any interference with Investor's ability or efforts, as a co-owner following exercise of the Option, to sell the Property as provided in Section 12 above; or (ii) rejects or takes any action to terminate this Agreement, except as expressly permitted under this Agreement. Such Default shall be subject to any notice and cure periods specified in Section 20.2 below.

**18.2 Misrepresentation.** Owner makes any representation or warranty to Investor that is false or misleading.

**18.3 Insolvency.** Owner commences any voluntary bankruptcy proceeding, or an involuntary bankruptcy proceeding is commenced against Owner and not dismissed within sixty (60) days, or (notwithstanding Section 7.5 of this Agreement) a receiver or conservator is appointed for the Property or Owner.

**19. Remedies.** Investor shall be entitled to the following remedies upon the occurrence and during the continuation of a Default, which remedies shall be cumulative and not exclusive:

**19.1 Notice of Default.** Investor at its option may declare a Default under this Agreement, provided that, in any circumstance where Investor becomes aware of a Default, a decision by Investor not to declare a Default shall not be deemed to constitute either (a) a waiver of Investor's right to declare a default at any time subsequent to such knowledge or (b) Investor's consent (whether prospective or retrospective) to any specific Default. To declare a Default,

Investor will deliver to Owner a written notice of such Default in accordance with Section 25.6 below ("**Notice of Default**").

**19.2   Cure or Termination By Owner.** If Investor has delivered a Notice of Default, if no Ultimate Sale by Investor is pending, Owner shall have the right for a period of thirty (30) days following delivery of the Notice of Default to: (i) cure the Default (if the Default is monetary in nature, by paying the monetary amount owed together with all accrued interest); or (ii) notify Investor of its intent to terminate the Option pursuant to Section 9.2 above, in which event Owner must complete the Owner Termination within sixty (60) days of such notice.

**19.3   Interest.** If Owner fails to repay any Protective Advance made by Investor pursuant to Section 10.1 above within ten (10) days of demand for payment, Owner shall further be liable to Investor for interest at the rate specified in Section 10.2 above on the amount of the Protective Advance. No Protective Advance shall be considered or treated as a loan, nor shall the incurring of any such interest or the payment of any such interest relieve Owner of liability for failing to make the relevant payment to Investor or extending the time for payment of the Protective Advance.

**19.4   Enforcement.** if Owner fails to comply with the terms of this Agreement, Investor may take such action as it deems appropriate to enforce the provisions of this Agreement (including but not limited to enforcement of its rights under the Security Instrument) and collect all Specific Monetary Amounts and all Liquidated Damages and all other amounts owed to it. To the extent that enforcement of the Security Instrument and any power of sale granted under the Security Instrument require specification of a liquidated bid amount, Investor may include all, or any, of the following:

**19.4.1** In connection with Owner's failure to make any monetary payment due and owing, the sum of all monetary obligations (including, without limitation, all Specific Monetary Amounts) owed to Investor by Owner under this Agreement.

**19.4.2** In connection with:   (1) any voluntary or involuntary transfer or any action that purports to transfer the Property without Investor's consent, (2) Owner's failure or refusal to transfer Owner's interest in the Property in accordance with this Agreement, (3) Owner's failure or refusal to permit or honor Investor's Right of First Refusal pursuant to Section 11.7 above, or (4) Owner's failure or refusal to cooperate with, or Owner's interference with, Investor's ability to sell the entire Property following Investor's exercise of the Option, as provided in Section 12 above: all Liquidated Damages.

**19.4.3** Owner and Investor agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) failure to comply with the terms of this Agreement are uncertain, depend on many factors, and would be extremely difficult to ascertain. Therefore, in a good faith effort to determine a method for reasonably estimating and liquidating the damages that would be incurred by Investor arising from Owner's (or Owner's executor) failure to comply with the terms of this Agreement, Investor and Owner agree to the Liquidated Damages specified below.  **"Liquidated Damages"** means an amount equal to:

i      the total of:

- 38 -

<blockquote>

<blockquote>

**(1)**     the Appraised Value of the Property (as determined by an appraisal of the Property as of the date when Owner breaches this Agreement);

**(2)**     minus any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

**(3)**     plus any Deferred Maintenance Adjustment;

</blockquote>

**ii**     multiplied by the Designated Percentage;

**iii**     minus, if the Option has not been exercised, the Remaining Portion of the Exercise Price;

**iv**     plus all monetary amounts owed to Investor as follows:

<blockquote>

**(1)**     any unreimbursed Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances; and

**(2)**     any unpaid Asset Management Fees.

</blockquote>

</blockquote>

**19.5**   **Other Rights.**   Notwithstanding anything to the contrary in this Section 20, Investor may exercise all other rights that Investor has under this Agreement.

**20.**   **Indemnification by Owner.**   Owner shall indemnify and hold Investor harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, Attorneys' Fees incurred by Investor in connection with defending or responding to such claims, damages, liabilities and actions) of every kind arising out of or relating to: (i) a breach of any of Owner's representations, or warranties or obligations under this Agreement; (ii) any act or omission by Owner or Owner's agents; or (iii) the Property.

**21.**   **Servicer.**   Owner acknowledges and consents to any assignment whereby the Servicer's responsibilities, including, but not limited to, the right to enforce this Agreement and the other Transaction Documents, are transferred from Investor to a third party.

**22.**   **Covenants to Run With Land.**   The provisions of this Agreement shall be deemed to be covenants running with the land so long as this Agreement remains in effect. Investor will record with the county recorder of the county in which the Property is located, a Recorded Memorandum reflecting this fact. Upon valid termination of this Agreement, the Recorded Memorandum shall automatically terminate, and Investor shall record such documents as are required to reflect such termination.

**23.**   **Relationship.**   Investor shall not be deemed a partner, joint venturer, trustee, lender or fiduciary with, or of, Owner. Owner shall not be permitted to execute any document or enter into any agreement on behalf of Investor, nor shall Owner be permitted to make any

- 39 -

representation on behalf of Investor or to represent himself, herself or itself as the agent or representative or partner of Investor, whether in connection with the Property or otherwise. **The Option is intended to and shall be treated for all purposes (including, without limitation, tax purposes) as an option to purchase real property and not as a purchase, loan, joint venture or partnership.**

24. **Multiple Owners and Revocable Trusts.**

24.1 If Owner is more than one Person:

24.1.1 the Transaction Documents must be signed by each such Owner;

24.1.2 all rights and powers specified for Owner in the Transaction Documents must be approved and exercised unanimously by all such multiple Owners;

24.1.3 all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under the Transaction Documents;

24.1.4 notice required to be given by, or to, an Owner will be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Exhibit C; and

24.1.5 Investor may treat any notice received from any one Owner as notice from all Owners.

24.2 If any Owner is/are the Trustee(s) of a Revocable Trust:

24.2.1 all Trustees and all Trustors must sign this Agreement and the other Transaction Documents in their capacities as individuals and as Trustees and/or Trustors, and each Trustee and Trustor who signs this Agreement hereby represents and warrants that all Trustees and Trustors have been disclosed to Investor;

24.2.2 any Trustee who is also a Trustor need only sign this Agreement and the other Transaction Documents once for them to be binding on such Person both as Trustee and as Trustor;

24.2.3 all rights and powers specified for, and all actions required of, Owner in the Transaction Documents must be approved and exercised by all Trustees unanimously;

24.2.4 all Trustees and all Trustors, in their capacities as individuals, shall be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under the Transaction Documents;

24.2.5 all representations and warranties by Owner in the Transaction Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustees and all Trustors in their capacities as individuals;

- 40 -

**24.2.6** notice required to be given by, or to, an Owner will be deemed adequately given if given by, or to, any of the Trustees using the contact information set forth in Exhibit C; and

**24.2.7** Investor may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

## 25. **Miscellaneous.**

**25.1** **Successors and Assignees.** This Agreement shall be binding on Owner's and Investor's successors and assignees. However, nothing in this provision shall permit assignment of this Agreement contrary to the express provisions of this Agreement.

**25.1.1** Pursuant to Section 2.6.1 above, Investor can assign its rights under the Transaction Documents in full or in part to any assignee, at which time such assignee shall have all of the rights, remedies and obligations of Investor under the Transaction Documents. In connection with any assignment, Investor may disclose all documents and information that Investor has, or may hereafter have, relating to Owner and the Property, subject to assignee's agreement to continue to observe Investor's policies regarding privacy and disclosure of personal and financial information. Investor will notify Owner no later than sixty (60) days after the effective date of any such assignment.

**25.1.2** Except as provided in Sections 9.5 and 11 above, Owner may not assign any of his, her or its rights, responsibilities or obligations under this Agreement absent the prior written consent of Investor.

**25.2** **Choice of Law; Venue.** This Agreement shall be determined under, governed by, and construed in accordance with the laws of the State in which the Property is located without reference to its conflict of laws principles. The parties agree that all actions or proceedings arising in connection with this Agreement shall be litigated only in the state and federal courts located in or having jurisdiction in connection with the county in which the Property is located. Owner waives any right Owner may have to assert the doctrine of *forum non conveniens* or to object to such venue.

**25.3** **Further Assurances.** The parties agree, from time to time, as and when requested by any other party to this Agreement or by its permitted successors or assignees, to: (i) execute and deliver, or cause to be executed and delivered, all such instruments; and (ii) take, or cause to be taken, all such further or other actions as may be reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Transaction Documents. Such actions shall include, without limitation, all actions necessary by the parties to correct any error or inaccuracy in the Transaction Documents or any other document related to the underlying Option Transaction, to ensure that such documents reflect the true and correct terms upon which the parties agreed to enter into this Option Transaction, and/or to replace any missing or misplaced documentation.

**25.4** **Severability; Waivers.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any provision. Owner acknowledges that the provisions contained in this

- 41 -

Agreement, including without limitation the special power of attorney granted in Section 12.4 above, are necessary and reasonable to protect Investor in connection with the purchase and potential exercise of the Option. Should any court find that any portion of this Agreement is unreasonable, invalid, or unenforceable, the parties hereby agree that any such provision shall be interpreted and enforced to the maximum extent to which the court deems reasonable. No waiver by Investor of any of its rights or remedies in connection with this Agreement shall be effective unless such waiver is in writing and signed by Investor. No delay or waiver by Investor in exercising any right shall be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse.

**25.5    Attorneys' Fees.** If a lawsuit or arbitration proceeding is commenced in connection with this Agreement or the other Transaction Documents, the prevailing party, as determined by the court or arbitrator, shall be entitled to recover Attorneys' Fees from the other party.

**25.6    Notices.** Any notice, demand or request required under this Agreement shall be given in writing at the addresses set forth in Exhibit C, and shall be transmitted by overnight delivery by a nationally recognized overnight courier service. Any such notice, demand or request shall be deemed received on the Business Day immediately following deposit with the overnight courier service or three Business Days following certified mailing through the U.S. Postal Service. Each party shall have the right to change the place to which notice shall be sent or delivered or to specify one additional address to which copies of notices shall be sent, in either case by similar notice sent or delivered in the same manner to the other party.

**25.7    Entire Agreement; Amendment.** The Exhibits below are incorporated herein by this reference. This Agreement, the Recorded Memorandum, the Security Instrument, and the other written agreements made by and between Owner and Investor as of the Effective Date together constitute the entire agreement between the parties pertaining to the subject matter contained in them. Except as expressly agreed in writing, all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement and the transaction which is the subject matter hereof, including but not limited to any and all offer letters, terms sheets and draft and earlier versions of settlements statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the party against whom enforcement is sought.

**25.8    Headings.** Article and section headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**25.9    Time of Essence.** Time is of the essence in this Agreement. All deadlines are to be interpreted and applied strictly.

**25.10    No Third-Party Beneficiaries.** This Agreement is entered into for the protection and benefit of Investor and Owner and their respective permitted successors and assignees with regard to their respective present and contingent ownership interests in the Property. No other Person shall have any rights or causes of action under this Agreement.

- 42 -

**25.11 Days of the Week.** Whenever the word "day(s)" is used in this Agreement, it shall refer to calendar day(s) unless it is expressly identified as being "Business Day(s)". When any date referred to in this Agreement for action to be taken falls on a day of the week that is other than a Business Day, then such date shall, for all purposes in this Agreement (unless otherwise required by statute), be deemed to be the Business Day immediately following such date.

**25.12 Counterparts; Electronic Signatures.** This Agreement may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same agreement. A signed copy of this Agreement transmitted by a party to another party via facsimile or by electronic means shall be binding on the signatory to that copy.

[Signatures on following page]

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.


**INVESTOR:**

PATCH SERVICES LLC.

By: _____

Name: Sundeep Ambati

Title: Authorized Signer

**OWNER:**

_____

[Beverly J Cary]

- 44 -

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**                                    **OWNER:**

PATCH SERVICES LLC.

By: _____          _____

Name: Sundeep Ambati                             [Beverly J Cary]

Title: Authorized Signer

- 44 -

## EXHIBIT A

## LEGAL DESCRIPTION

The Land referred to herein below is situated in an Unincorporated Area in the County of KING, State of Washington, and is described as follows:

LOT 4, THE RESERVE AT STAR LAKE, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 216 OF PLATS, PAGE(S) 72 THROUGH 76, RECORDS OF KING COUNTY, WASHINGTON.

FOR INFORMATION ONLY: LOT 4, THE RESERVE AT STAR LAKE, VOL 216, PG 72-76, KING COUNTY, WA.

APN #: 723759-0040

# EXHIBIT B

## DEFINITIONS

**Definitions.** As used in this Agreement, the following terms shall have the meanings specified below:

1. **Adjustment Factor:** The adjustment that is made to the Exercise Price, as set forth in Exhibit C, if the value of the Property when the Option is exercised is greater than or equal to the Original Agreed Value.

2. **Agreement.** This Patch Services LLC Real Estate Purchase Option Agreement between Owner and Investor and all exhibits, schedules, attachments, and all amendments, supplements, and addenda now or hereafter executed by the parties.

3. **Appraisal Expenses.** All fees and expenses owed to third parties (but excluding Attorneys' Fees) in connection with an appraisal or other valuation of the Property.

4. **Appraised Value.** The value of the Property determined in accordance with the procedures set forth in Section 14.

5. **Approved Pre-Existing Lien.** A perfected lien upon the Property securing a Pre-Existing Loan: (i) that is senior to (1) the lien of the Security Instrument, (2) the covenants running with the land under this Agreement, and (3) the Option; (ii) of which Investor had actual written notice under a title report, title search or title commitment obtained in connection with this Option Transaction; and (iii) that is approved in writing by Investor on or before Investor's execution of this Agreement.

6. **Approved Pre-Existing Loan.** An obligation secured by an Approved Pre-Existing Lien, including, without limitation, any and all principal, interest, and expenses.

7. **Approved Subsequent Lien.** A lien upon the Property securing an Approved Subsequent Loan that is perfected after the Effective Date.

8. **Approved Subsequent Loan.** A loan or other obligation secured by the Property that is approved in writing by Investor, as so secured, after the Effective Date.

9. **Asset Management Fees.** Fees, costs and charges of the type further described in Section 7.7, which Asset Management Fees are designed to compensate the Servicer for the time, effort, costs and expenses incurred by Servicer in responding to requests from Owner or defaults by Owner under the Transaction Documents or in performing other necessary and reasonable acts pursuant to the Transaction Documents.

10. **Attorneys' Fees.** All court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of Investor's in-house counsel. Attorneys' Fees shall include, without limitation, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Agreement or the other Transaction Documents, to the interpretation or

- 1 -

enforcement of the parties' rights under this Agreement or the other Transaction Documents, or to the Property.

11. **Business Days.** Any day other than a Saturday, a Sunday, Good Friday, the day after Thanksgiving, or a day on which commercial banks in New York or the State in which the Property is located are required or authorized to be closed.

12. **Closing Costs.** All (i) ordinary and customary costs in connection with any sale or other transfer of the Property or any assignment or exercise of the Option related to such transfer, including, without limitation, recording fees and costs, reconveyance fees, escrow fees, title insurance fees, real estate excise tax and documentary or other transfer taxes, and (ii) federal, state or local taxes (excluding income taxes) arising, incurred or owed in connection with (1) Investor's exercise or sale of the Option, (2) a sale of the Property, (3) any related closing of that sale, or (4) any related escrow. However, the term "Closing Costs" shall not include costs (A) at the original granting of the Option as of the Effective Date, the amounts as listed below as being included in the Servicing Fees, or (B) that are owed or incurred by a third party other than Investor in connection with a sale of the Property to that third party, or (C) that would have been paid by a third party buyer of the Property but are assumed by Investor in connection with Investor's exercise of its Right of First Refusal.

13. **Covenant Fee.** A fee that is paid by Investor to Owner concurrently herewith as partial consideration for this Agreement.

14. **Deferred Maintenance Adjustment.** An amount equal to Investor's commercially reasonable estimate of the dollar amount of any deferred maintenance, as further described in Section 11.3.2, as determined by Investor in connection with any of the computations to be made under this Agreement or any of the other Transaction Documents.

15. **Designated Percentage.** That undivided fractional interest in the Property that Investor has the right to acquire and Owner has agreed to sell if the Option is exercised as set forth in Exhibit C.

16. **Effective Date.** Is defined in the first paragraph of this Agreement.

17. **Effective Sales Price.** The monetary amount for which the Property is to be sold or transferred by Owner or Investor, as applicable, to an Ultimate Buyer, as adjusted, as set forth below. The Effective Sales Price shall be the sum of all amounts set forth or that would otherwise be set forth in Section M of the Closing Cost Details of the TILA-RESPA Integrated Disclosure Closing Disclosure Form (or any successor form) prepared by an escrow agent (which shall include the fair market value of any non-cash consideration received by, or for the benefit of, Owner and/or Investor in connection with the sale of the Property). Investor may elect to review the sales contract, and if Investor, through the exercise of its reasonable discretion, determines that the fair market value of any non-cash consideration is not properly reflected in the aforementioned Section M, make a good faith reasonable determination of the value of any non-cash consideration to be received by Owner and/or Investor and include it in the calculation of Effective Sales Price. The calculation of the Effective Sales Price shall not

include any deduction for any: (i) Closing Costs; (ii) liens on the Property; (iii) outstanding taxes; (iv) Sales Commissions; (v) Appraisal Expenses; and (vi) loans secured by the Property.

**18.**   **Default.** Is defined in Section 18.

**19.**   **Exercise Price.** The amount Investor has agreed to pay for the Designated Percentage of the Property upon exercise of the Option, as set forth in Exhibit C. If the amount Investor has agreed to pay is an amount that changes over time, the Exercise Price shall be the amount to be paid as of: (i) if a sale of the Property (including under exercise of a Right of First Refusal) or an Owner Termination of the Option is involved, the date on which the transaction closes; (ii) if a destruction or condemnation of the Property is involved, the date of such destruction or condemnation; or (iii) if a calculation of Liquidated Damages is involved, the date of the occurrence of the event (or the last of the events) that gave rise to the Liquidated Damages. Exercise Price is a defined term used in various calculations made under this Agreement, and when so used shall refer to the applicable dollar amount whether or not the Option is, in fact, exercised.

**20.**   **Expiration Date.** Is defined in Exhibit C.

**21.**   **Hazardous Materials.** Is defined in Section 17.1.

**22.**   **Initial Term.** The period of time, as set forth in Exhibit C, applicable to the Owner Termination Price in Section 9.2.2.

**23.**   **Investor.** Is defined in the first paragraph of this Agreement.

**24.**   **Investor Condemnation Credit.** Is defined in Section 16.3.2.

**25.**   **Investor's Interest.** The interest and rights that Investor has with regard to the Property (matured or unmatured, contingent or non-contingent, present or prospective), all other rights that Investor has under this Agreement, the Recorded Memorandum and the Security Instrument.

**26.**   **Liquidated Damages.** Is defined in Section 19.4.

**27.**   **Maximum Authorized Debt.** The maximum principal amount of total indebtedness secured by any lien on the Property that Owner is permitted to incur under this Agreement, which amount is specified in Exhibit C. In the case of an open end line of credit, the unused portion of any committed line of credit shall be considered principal indebtedness for purposes of determining whether the aggregate amount of indebtedness exceeds the Maximum Authorized Debt.

**28.**   **Modification Adjustment.** The adjustment, calculated pursuant to Section 14.4.1, that takes into account the increase or decrease in market value attributable to any Prohibited Uses of the Property by Owner during the term of this Agreement.

**29.**   **Net Condemnation Proceeds.** Is defined in Section 16.1.

- 3 -

**30.** **Option.** The rights of Investor, pursuant to this Agreement, to acquire the Designated Percentage of the Property and obtain specific performance of Owner's obligations under this Agreement if Investor exercises the Option.

**31.** **Option Fee.** Is defined in Section 2.2 of this Agreement.

**32.** **Option Title Insurance Policy.** A title insurance policy issued to, or for the benefit of, Investor or Investor's assignee, at the time that this Agreement is entered into and insuring Investor's or Investor's assignee's rights under this Agreement, the Security Instrument and the Recorded Memorandum.

**33.** **Option Transaction.** A transaction, including, without limitation, the transaction contemplated under this Agreement, in which Investor acquires an option to purchase a fractional interest in specified residential real property.

**34.** **Original Agreed Value.** The value of the Property determined by Investor and agreed to by Owner at the time of the origination of the Option, as specified in Exhibit C.

**35.** **Owner.** All of the Persons, individually and collectively, who appear on the record title to the Property as holding fee simple title to one hundred percent (100%) of the Property as of the Effective Date.

**36.** **Owner Termination.** Is defined in Section 9.2.1.

**37.** **Owner Termination Price.** Is defined in Section 9.2.2.

**38.** **Permitted Encumbrances.** All licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject at the time this Agreement becomes effective: (i) that are stated as exceptions on the Option Title Insurance Policy, or (ii) to which Investor has expressly agreed in writing that the Property will remain subject following any exercise of the Option by Investor. In no event will "Permitted Encumbrances" include any Senior Loans, Senior Liens, or any other liens that secure the payment of any loans or the performance of any obligations owed to any creditor.

**39.** **Permitted Sale.** Is: (i) an Ultimate Sale by Owner in compliance with Section 11; (ii) an Ultimate Sale expressly consented to in writing by Investor; or (iii) an Ultimate Sale by Investor in compliance with Section 12.

**40.** **Person.** An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing.

**41.** **Post-Owner Termination Disposition.** Is defined in Section 9.2.5.

**42.** **Pre-Existing Lien.** A lien upon the Property that is perfected prior to the Effective Date.

- 4 -

43.    **Principal Residence.** The dwelling where Owner maintains his, her or their principal place of abode and resides the majority of the calendar year. In the case of a Revocable Trust in which the Trustor(s) and Trustee(s) are not identical, references to the "Owner" in the preceding sentence shall mean Trustor(s). A person may only have one Principal Residence at any time. Owner shall be conclusively deemed to *not* meet this requirement if an Owner fails to occupy the Property for a period longer than twelve (12) consecutive month. Owner must certify to Investor his, her or their Principal Residence annually within thirty (30) days after the anniversary of the Effective Date, and must notify Investor of absences from the Property in excess of any consecutive period of two (2) months. Without the prior written permission of Investor, Owner shall not enter into any lease or occupancy agreement for the Property or accept any rent or other consideration for the right to use or occupy the Property. Notwithstanding the foregoing, if the Property includes two (2) to four (4) legal dwelling units, the exercise of the Option permitted by Section 2.4.3 shall apply only to the one unit that Owner occupies.

44.    **Pre-Existing Loan.** A loan or other obligation secured by a Pre-Existing Lien.

45.    **Prohibited Use.** Is defined in Section 7.4.

46.    **Property.** The residential real property owned by Owner that is the subject of the Option. The legal description of the Property is set forth as Exhibit A. The Property shall include only the real property described in Exhibit A and the fixtures appurtenant to that real property, and shall not include any other personal property of Owner.

47.    **Protective Advances.** Any advances made by Investor that are the primary responsibility of Owner under this Agreement but are made by Investor for purposes of protecting Investor's Interest, as more completely described in Section 10.1.

48.    **Recorded Memorandum.** The Memorandum, entered into by Investor and Owner concurrently with this Agreement, which shall be recorded in the public records evidencing: (i) the provisions of this Agreement that constitute covenants running with the land; (ii) the Option; and (iii) the Power of Attorney granted by Owner.

49.    **Registered Domestic Partner.** A registered domestic partner pursuant to the laws of the State in which the Property is located.

50.    **Remaining Portion of the Exercise Price.** The Exercise Price minus the Option Fee (provided that this defined term shall only apply if the Option has not yet been exercised).

51.    **Revocable Trust.** A revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

52.    **Right of First Refusal.** The right of Investor under Section 11.7 and the right of Owner under Section 12.7 to purchase the Property on the same terms the Property is proposed to be sold to a third party under an Ultimate Sale.

53.    **Sales Commissions.** All broker fees, sales commissions, finder fees and all other fees and costs owed to any broker, real estate agent or finder and incurred in connection with a sale or transfer of the Property or any interest in the Property.

- 5 -

**54.** **Security Instrument.** The Deed of Trust (Non-Recourse) and Security Agreement or Mortgage (Non-Recourse) and Security Agreement, entered into concurrently with this Agreement, that is recorded in the official records of the county in which the Property is located and that evidences a lien on Owner's entire interest in the Property, which instrument is incorporated into this Agreement by this reference.

**55.** **Senior Liens.** Liens on the Property that are perfected prior to or are otherwise senior to Investor's Interest.

**56.** **Senior Loans.** Loans or other obligations that are secured by Senior Liens.

**57.** **Servicer.** The entity responsible for monitoring Owner's compliance with, and discharging Investor's responsibilities under, this Agreement. Initially, the Servicer will be Investor.

**58.** **Servicing Fees.** The fees for obtaining any credit requests, recording documents, notary expenses, carrier charges, document preparation and servicing the Option.

**59.** **Solicited Sale Value.** If within ninety (90) days prior to the closing of an Owner Termination under Section 9.2, Owner or Investor receives, or has pending, a written offer for the purchase of the Property, the Solicited Sale Value shall equal the gross amount of such offer, with no deduction or adjustment for any costs that Owner may incur if a sale of the Property were to be completed pursuant to such offer.

**60.** **Specific Monetary Amounts.** All unpaid or unreimbursed Protective Advances, Asset Management Fees and all other fees and charges owed to and specified by Investor, including interest on such amounts where appropriate.

**61.** **Termination Date.** The date on which: (i) this Agreement terminates, which date shall be the "**Expiration Date**" set forth in Section 2.3; or (ii) this Agreement is terminated or terminates pursuant to Section 5.2, whichever is earlier.

**62.** **Transaction Documents.** This Agreement, the Recorded Memorandum, the Security Instrument and any amendments or supplements to any of these documents.

**63.** **Trustor(s).** The Person or Persons designated as the "**trustor**" or "**settlor**" of a Revocable Trust in its formation documents.

**64.** **Trustee(s).** The Person or Persons designated as the "**trustee**" of a Revocable Trust in its formation documents and any subsequent amendments, and any successor trustees under such Revocable Trust.

**65.** **Ultimate Buyer.** The Person that purchases, or proposes to purchase, the Property in an Ultimate Sale. This Person may be Investor.

**66.** **Ultimate Sale.** A sale by Owner (or Investor under Section 12) of all, or an interest in, the Property to a third Person following the creation of the Option. This term "Ultimate Sale" excludes the sale of the Designated Percentage pursuant to the Option.

- 6 -

**EXHIBIT C**

**FINANCIAL TERMS AND FEES**

| | | |
|---|---|---|
| **(a)** | **Option Fee:** | $62,000 |
| **(b)** | **Covenant Fee:** | $250 |
| **(c)** | **Designated Percentage:** | 57.91% |
| **(d)** | **Adjustment Factor:** | 17.13% |

**(e)** **Exercise Price:** Unless otherwise specifically provided for in the Agreement, the Exercise Price shall be as follows:

　　**i.** If the greater of any Solicited Sale Value or the Appraised Value of the Property, as applicable, is greater than or equal to the Original Agreed Value, the Exercise Price is calculated as the Designated Percentage multiplied by: the Original Agreed Value times (1- Adjustment Factor).

　　**ii.** If the greater of any Solicited Sale Value or the Appraised Value of the Property, as applicable, is less than the Original Agreed Value, the Exercise Price is calculated as the Designated Percentage multiplied by the Original Agreed Value.

| | | |
|---|---|---|
| **(f)** | **Expiration Date:** | The Tenth (10) anniversary of the Effective Date. |
| **(g)** | **Initial Term:** | Thirty-six (36) months/years |
| **(h)** | **Maximum Authorized Debt:** | $159,634 |
| **(i)** | **Original Agreed Value:** | $318,000 |
| **(j)** | **Servicing Fees:**<br>**(3% of the Option Fee)** | $2,000 |
| **(k)** | **Principal Residence of Owner:** | ☑ |

**(Check only if Property is the Principal Residence)**

**Address for Notice to Owner:**
**Beverly J Cary**
27834 31ST PL S
AUBURN, WA 98001

**Address for Notice to Investor:**
Patch Services LLC,
576 Sacramento St 4th Floor
San Francisco, CA 94111
Attn: Sundeep Ambati

- 1 -

[Signatures on following page]

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

PATCH SERVICES LLC.

By: _____

Name: Sundeep Ambati

Title: Authorized Signer

Date signed: 7-18-19

**OWNER:**

_____

[Beverly J Cary]

Date signed: 7/23/19

- 2 -

[Signatures on following page]

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

PATCH SERVICES LLC.

By: _____

Name: Sundeep Ambati

Title: Authorized Signer

Date signed: 7-18-19

**OWNER:**

_____

[Beverly J Cary]

Date signed: _____

- 2 -

**EXHIBIT D**

**NOTICE OF RIGHT OF FIRST REFUSAL PURSUANT TO SECTION 11.7 OF
PATCH SERVICES LLC REAL ESTATE PURCHASE OPTION AGREEMENT
("AGREEMENT")**

_July 23_, 20 _19_

Patch Services LLC
576 Sacramento St 4th Floor
San Francisco, CA 94111
Attn: Asset Management

    Re:    Investor's Right of First of Refusal

Dear Sir or Madam:

Owner hereby certifies that: (i) Owner has received a bona fide offer to purchase the Property and that a true, correct and complete copy of that offer is attached to this letter ("**Offer**"); and (ii) should Investor decline its right of first refusal, Owner will accept the Offer.

Pursuant to Section 11.7 of the Agreement between the undersigned ("**Owner**") and Investor, Owner hereby offers to sell the Property to Investor for the price and subject to the terms and contingencies set forth in the Offer, with proceeds to Owner calculated in the manner set forth in Section 11.7 of the Agreement.

**All Owners Must Sign** (if Owner is/are the Trustee(s) of a Revocable Trust, all Trustors and Trustees must sign both as Trustors and/or Trustees, and as individuals)

**BY ITS EXECUTION BELOW, INVESTOR HEREBY AGREES TO PURCHASE THE PROPERTY ON THE SAME TERMS AND CONDITIONS AS THOSE SET FORTH IN THE OFFER**

**PATCH SERVICES LLC.**

By: _____    DATE: _____

Print Name: Sundeep Ambati

Its: Authorized Signer

- 1 -

<u>**EXHIBIT E**</u>

**NOTICE OF RIGHT OF FIRST REFUSAL PURSUANT TO SECTION 12.7 OF
PATCH SERVICES LLC REAL ESTATE PURCHASE OPTION AGREEMENT
("AGREEMENT")**

July 23 , 20 19

**Beverly J Cary**
27834 31ST PL S
AUBURN, WA 98001

      Re:   Owner's Right of First of Refusal

Dear Sir or Madam:

Investor hereby certifies that: (i) it has received a bona fide offer to purchase the Property and that a true, correct and complete copy of that offer is attached to this letter ("**Offer**"); and (ii) should Owner decline its right of first refusal, Investor will accept the Offer.

Pursuant to Section 12.7 of the Agreement between the above addressee ("**Owner**") and Investor, Investor hereby offers to sell the Property to Owner for the price and subject to the terms and contingencies set forth in the Offer, with proceeds to Investor calculated in the manner set forth in Section 12.8 of the Agreement.

                                                   _____

                             By: _____

**BY ITS EXECUTION BELOW, OWNER HEREBY
AGREES TO PURCHASE THE PROPERTY ON
THE SAME TERMS AND CONDITIONS AS THOSE
SET FORTH IN THE OFFER**

<u>**OWNER:**</u>

_____
[Beverly J Cary]

Dated: _7/23/19_____

- 1 -

## EXHIBIT F

## FORM OF THE RECORDED MEMORANDUM

**EXHIBIT G**

**FORM OF THE SECURITY INSTRUMENT**

# EXHIBIT C

Instrument Number: 20190821001118  Document:DT Rec: $116.50 Page-1 of 13
  Record Date:8/21/2019 3:57 PM
Electronically Recorded  King County, WA

20190821001118.001

,(          .

**RECORDING REQUESTED BY:**

Patch Services, LLC.

*WHEN RECORDED, RETURN TO:*
*FIRST AMERICAN TITLE INSURANCE CO.*
*4795 REGENT BLVD, 1010-E*
*IRVING, TX 75063*
*ATTN: RLA RECORDING*

Transaction ID. 201907-CARY-01

---

## DEED OF TRUST (NON-RECOURSE)
## AND SECURITY AGREEMENT

Grantor(s):        BEVERLY J. CARY

Grantees:        <u>First American Title Company, a Title Insurance Company</u> (Trustee)
                 Patch Services, LLC. (Beneficiary)

Abbreviated Legal:  LOT 4, THE RESERVE AT STAR LAKE, VOL 216, PG
                    72-76, KING COUNTY, WA.

Tax Parcel No.:     723759-0040

THIS DEED OF TRUST (NONRECOURSE) AND SECURITY AGREEMENT ("**Security Instrument**"), is made as of JULY 18 _____, 20 19 ("**Effective Date**"), by Beverly J Cary (individually or collectively "**Trustor**"), to First American Title Insurance Company ("**Trustee**"), whose address is 1855 Gateway Blvd., Suite 700, Concord, CA 94520, for the benefit of PATCH SERVICES, LLC, a Delaware corporation, and its successors and assignees ("**Beneficiary**"), whose address is 730 Commercial Street, San Francisco, CA 94108. Capitalized terms used in this Security Instrument shall have the meanings specified in this Security Instrument, or if not defined herein, in that certain Patch Services, LLC Real Estate Purchase Option Agreement dated as of the Effective Date ("**Option Agreement**") executed by Trustor as owner, and Beneficiary as investor, concurrently with this Security Instrument.

### 1.    Grant In Trust.

TRUSTOR HEREBY IRREVOCABLY grants, conveys, warrants and assigns to Trustee, and its successors and assignees, in trust, with power of sale, all right title and interest which

Trustor now has or hereinafter may acquire in that certain real property ("**Real Property**") located in King County, State of Washington, described in <u>Exhibit A</u> attached hereto and made a part hereof.

Together with all improvements, replacements and additions now or hereafter erected on the Real Properly and all easements, appurtenances and fixtures now or hereafter a part of the Real Property. (The fixtures, improvements and the Real Property are collectively referred to as the "**Property**.")

Together with all rents, issues, profits and proceeds, including without limitation insurance and condemnation proceeds from the Real Property, subject, however, to the right, power and authority given to the conferred upon Beneficiary below to collect and apply such rents, issues and profits.

The Property is not used principally for agricultural purposes.

2.  **Secured Obligations.** Trustor makes the grant, transfer and assignment set forth in the "Grant in Trust" Section above for the purpose of securing the following obligations (collectively, the "**Obligations**"):

a.  the performance and payment of all obligations of Trustor under the Option Agreement, including without limitation, the following:

(i)  payment of all Protective Advances, including any unpaid interest and other fees and charges associated with such Protective Advances, owed to Beneficiary under the Option Agreement;

(ii)  payment of all Asset Management Fees owed to Beneficiary under the Option Agreement;

(iii)  payment of all insurance proceeds owed to Beneficiary pursuant to Section 15 of the Option Agreement;

(iv)  payment of all condemnation proceeds owed to Beneficiary pursuant to Section 16 of the Option Agreement;

(v)  payment of all amounts owed to Beneficiary pursuant to Section 9.2 of the Option Agreement;

(vi)  payment of all sales proceeds owed to Beneficiary in connection with any sale of the Property pursuant to Sections 11 and 12 of the Option Agreement;

(vii)  performance of the obligations of Trustor (A) under Section 11.7 of the Option Agreement regarding Beneficiary's Right of first Refusal, and (B) under Section

130134.0003/7053876 3

**Transaction ID:** 201907-CARY-01

12 of the Option Agreement regarding Beneficiary's right as a co-owner to sell the Property following exercise of the Option; and

(viii)  damages (subject to liquidation as provided below) arising to, or incurred by, Beneficiary from Trustor's failure to act or interference with Beneficiary's Right of First Refusal pursuant to Section 11 of the Option Agreement, and right to sell the Property pursuant to Section 12 of the Option Agreement.  Trustor and Beneficiary agree and acknowledge that the damages that would arise from Trustor's failure to act or interference are uncertain, depend on many factors, and would be extremely difficult to ascertain.  Therefore, in a good faith effort to determine a method for reasonably estimating and liquidating the damages which would be incurred by Beneficiary arising from Trustor's interference or failure to act, Trustor and Beneficiary agree to the Liquidated Damages specified in Section 8 below;

b.     the performance of the obligations of Trustor contained in this Security Instrument or incorporated by reference;

c.     any expenditures made by Beneficiary pursuant to, or under, this Security Instrument; and

d.     payment of all fees and expenses, including, without limitation court costs and other dispute resolution costs, attorneys' (including Beneficiary's in-house counsel, if any), and experts' fees and costs (collectively "**Attorneys' Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, or otherwise, and whether or not litigation or arbitration is commenced, which are in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

Trustor shall not be obligated to repay any part of the Option Fee or the Covenant Fee (as those terms are defined in Exhibit B to the Option Agreement); and therefore, such items shall not be included within the Obligations.  The foregoing shall <u>not</u>, however, in any way limit any payments due Beneficiary under the Option Agreement pursuant to its Designated Percentage (as defined in Exhibit B to the Option Agreement).  In addition, this Security Instrument will not secure performance of the Environmental Indemnity pursuant to Section 17.3 of the Option Agreement, the indemnification provisions of Section 20 of the Option Agreement or any provisions that survive termination of the Option Agreement, as set forth in Section 5.3 of the Option Agreement.

**3.     Uniform Commercial Code, Security Agreement and Fixture Filing.**  This Security Instrument is intended to be and shall constitute a security agreement under the Washington Uniform Commercial Code, RCW Chapter 62A.9A (the "**Uniform Commercial Code**"), for any items of personal property that constitute fixtures or are specified as part of the

130134.0003/7053876.3

Property and that under applicable law may be subject to a security interest under the Uniform Commercial Code. Trustor hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

a.  Trustor agrees that Beneficiary may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index under the laws of the State in which the Property is located, as a financing statement for any of the items specified above as part of the Property.

b.  This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the Uniform Commercial Code, and any similar or successor provisions. For purposes of the fixture filing, the "debtor" is Trustor and the "secured party" is Beneficiary. The goods subject to the fixture filing consist of all equipment and appliances attached to the Property or which are considered a fixture under the laws of the State in which the Property is located, including all heating, cooling, and ventilation equipment, ducting, appliances, and fixtures; and all plumbing equipment, piping, and fixtures; and all electrical and telecommunications equipment, wiring, cabling, conduit, and fixtures; and all other equipment attached to or used in the operation of the Property, and all proceeds thereof.

c.  Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

d.  Trustor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Beneficiary may reasonably require.

e.  On any default hereunder Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Beneficiary may proceed against the items of the Property constituting the Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the Uniform Commercial Code or the remedies in Section 7 below.

4.  **Assignment of Leases And Rents**. As additional security for the Obligations, Trustor hereby irrevocably, absolutely and unconditionally assigns to Beneficiary all of Trustor's right, title and interest in and to all existing and future leases, subleases and licenses relating to the use, occupancy or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds and earnings now or hereafter payable with respect to the ownership, use or occupancy of the Property (collectively the "**Rents**"):

a.  Trustor hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving

130134.0003/7053876.3

**Transaction ID:** 201907-CARY-01

unto Trustor the right, prior to any default by Trustor in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

b.      Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine.

c.      The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

d.      Nothing in this section shall permit Trustor to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

5.      **Covenants of Trustor Regarding the Property.**  Trustor hereby agrees as follows:

a.      To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Beneficiary or Trustee: and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Security Instrument; and/or (ii) in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

b.      To pay: (i) at least ten (10) days before delinquency all taxes and assessments affecting the Property; and (ii) all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

(i)      If Trustor fails to make any payment or to do any act as provided in this Security Instrument, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary

130134.0003/7053876.3

**Transaction ID:** 201907-CARY-01

or Trustee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' fees) shall also be secured by this Security Instrument.

(ii)     Such performance by Beneficiary or Trustee shall not require notice to, or demand on Trustor and shall not release Trustor from any obligation under this Security Instrument.

(iii)     Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

c.     To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the highest rate permissible under the laws of the State in which the Property is located (or other applicable law); from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6.     **Power of Attorney.** Trustor hereby irrevocably appoints Beneficiary as Trustor's attorney-in-fact (such agency being coupled with an interest), and as such attorney-in-fact Beneficiary may, after providing notice to Trustor pursuant to the Option Agreement, without the obligation to do so, in Beneficiary's name, or in the name of Trustor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Trustor; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7.     **Default and Foreclosure and Power of Sale.** Upon default by Trustor in the performance of or upon breach by Trustor of any of the rights and obligations that are secured by this Security Instrument as specified above, Beneficiary may declare all sums secured by this Security Instrument immediately due and payable and may invoke the power of sale and any other remedies permitted by applicable law, including an action in any court of competent jurisdiction to foreclose this Security Instrument as a deed of trust or mortgage. If Beneficiary elects to invoke the power of sale, Beneficiary shall comply with all requirements and prerequisites for the issuance of a notice of default in accordance with the laws of the State in which the Property is located, and shall cause such notice of default to be transmitted and/or posted on the Real Property, as required by applicable law. Beneficiary also shall deposit with Trustee this Security Instrument and all documents evidencing any expenditures and damages

130134 0003/7053876.3

Transaction ID: 201907-CARY-01

secured by this Security Instrument.  Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law.

      a.     After the required time period has lapsed following the recordation, transmittal and/or posting of said notice of default as required by law, Trustee without demand on Trustor, shall sell the Property at the time and place specified in the notice of sale, cither as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale.  Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement, at the time fixed by the preceding postponement.  Trustee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts shall be prima facie evidence of their truthfulness.  Any person, including Trustor or Beneficiary as defined in this Security Instrument (but not including the Trustee), may purchase at such sale.

      b.     Trustee shall apply the proceeds of the sale in accordance with the laws of the State in which the Property is located.

      c.     Notice provided to Trustor under this Security Instrument shall be to the address specified in this Security Instrument unless otherwise required by law.

      **d.     Upon completion of the sale as set forth above, there shall be no deficiency against Trustor for any obligations secured hereby, all reimbursements to Beneficiary being derived solely from the proceeds of the Property.**

      8.     **<u>Liquidated Damages</u>.**  Liquidated Damages means an amount equal to:

      a.     the total of:

      (i)     the Appraised Value of the Property (as determined by an appraisal of the Property as of the date when Trustor takes the action, or fails to take the action, that results in interference with Beneficiary's rights under the Option Agreement);

      (ii)     <u>minus</u> any Modification Adjustment (provided that if the Modification Adjustment is a negative number the absolute value of that number shall be added rather than subtracted);

      (iii)     <u>plus</u> any Deferred Maintenance Adjustment.

      b.     <u>multiplied</u> by the Designated Percentage.

      c.     <u>minus</u>, if the Option has not been exercised, the Remaining Portion of the Exercise Price.

130134 0003/7053876.3

Transaction ID: 201907-CARY-01

9. **No Waiver**. No previous waiver and no failure, delay or forbearance by Beneficiary in acting with respect to the terms of this Security Instrument shall constitute a waiver of any breach, default, or failure of condition under this Security Instrument or the obligations secured thereby. A waiver of any term of this Security Instrument or of any of the obligations secured thereby must be made in writing and shall be limited to the express written terms of such waiver.

10. **Trustee's Powers.** At any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Option Agreement secured hereby, Trustee may: (a) reconvey any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

11. **Substitution of Trustee.** Beneficiary, or any successor in ownership of the Obligations, may from time to time substitute a successor or successors to any Trustee named or acting under this Security Instrument, by instrument in writing executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated. Upon such recording, such successor Trustee or Trustees shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties.

12. **Trustee's Compensation.** Trustor shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this Security Instrument, including Attorneys' Fees. Trustor shall pay to Beneficiary reasonable compensation for services rendered concerning this Security Instrument, including without limit any statement of amounts owing under any Obligations.

13. **Full Reconveyance.** Upon written request of Beneficiary stating that all Obligations have been performed or paid, and upon surrender of this Security Instrument to Trustee for disposition as Trustee in its sole discretion may choose, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Security Instrument. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "*the person or persons legally entitled thereto.*"

14. **Successors.** This Security instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "**Beneficiary**" shall include any successor or assignee of Beneficiary's rights in the Option Agreement and in this Security Instrument, whether or not named as Beneficiary in this Security instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

130134.0003/7053876 3

Transaction ID: 201907-CARY-01

**15.** **Joint and Several Liability.** If more than one person signs this Security Instrument as Trustor, the obligations of each signatory shall be joint and several.

**16.** **Multiple Owners.** If there are multiple Trustors of the Property:

a. this Security Instrument must be signed by each such Trustor;

b. all rights and powers specified for Trustor in this Security Instrument must be approved and exercised unanimously by all such multiple Trustors;

c. all such multiple Trustors shall be jointly and severally liable for all liabilities and obligations specified for Trustor under this Security Instrument;

d. Beneficiary may treat any notice received from any one Trustor as notice from all Trustors.

**17.** **Revocable Trust**. If any Trustor is/are the trustee(s) of a Revocable Trust (as defined in Exhibit B to the Option Agreement):

a. all trustees and all trustors of the Revocable Trust must sign this Security Instrument in their capacities as individuals and as trustees and/or trustors of the Revocable Trust, and each trustee and trustor of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and trustors of the Revocable Trust have been disclosed to Beneficiary;

b. any trustee of the Revocable Trust who is also a trustor of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as trustor of the Revocable Trust;

c. all rights and powers specified for, and all actions required of, Trustor in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

d. all trustees and all trustors of the Revocable Trust, in their capacities as individuals, shall be jointly and severally liable with Trustor for all liabilities and obligations specified for Trustor under this Security Instrument;

e. all representations and warranties by Trustor in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all trustees and all trustors of the Revocable Trust in their capacities as individuals;

f. notice required to be given by, or to, any Trustor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in this Security Instrument; and

130134.0003/7053876 3

**Instrument Number: 20190821001118  Document:DT Rec: $116.50 Page-10 of 13**
**Record Date:8/21/2019 3:57 PM King County, WA**

20190821001118.010

**Transaction ID:** 201907-CARY-01

g.     Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Trustor.

**18.     Acceptance and Representations by Trustee.**  Trustee accepts this trust when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law.  Trustee is not required to notify any party to this Security Instrument of pending sale under any other deed of trust or mortgage (as appropriate) or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.  Trustor represents and warrants to Holder that: (a) Trustor has good and marketable title to the Property, free and clear of all claims and encumbrances whatever; (b) the lien created by this Security Instrument is a valid lien on the Property; and (c) Trustor will defend the lien of this Security Instrument against all adverse and conflicting claims of any nature whatsoever.

**19.     Incorporation by Reference.**  "Exhibit B" to the Option Agreement, including all defined terms provided therein, is hereby incorporated by this reference.

**20.     Extent of Lien**.  The lien and security interests granted to Beneficiary under this Security Instrument shall encumber Trustor's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

**21.     No Merger**.  So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Trustor in the Property or any part thereof (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

**22.     Governing Law.**  This Security Instrument shall be governed by the laws of the State in which the Property is located.

**23.     Remedies Cumulative**.  All remedies provided in this Security Instrument are distinct and cumulative to any other right or remedy under this Security Instrument or afforded by law or equity, and may be exercised concurrently, independently or successively.

**24.     Severability**.  If any provision of this Security Instrument is held to be invalid, illegal, or unenforceable, that invalidity, illegality, or unenforceability will not affect any other provisions of this Security Instrument, and the other provisions will be construed as if the invalid, illegal, or unenforceable provision had never been contained in the Security Instrument.

**25.     Captions.**  The captions and headings in this Security Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

**26.     Time.**  Time is of the essence of each and every term herein.

Page 10 of 13

130134 0003/7053876 3

Transaction ID: 201907-CARY-01

**27.** **Integration.** This Security Instrument contains or expressly incorporates by reference the entire agreement of the parties with respect to the matters contemplated herein and supersede all prior negotiations or agreements, written or oral. This Security Instrument shall not be modified except by written instrument executed by all parties.

*[Signatures on following page]*

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT.  ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND ANY OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN TRUSTOR AND BENEFICIARY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, each undersigned Trustor has executed this Security Instrument as of the Effective Date.

TRUSTOR(S):

_____
[Beverly J Cary]

Trustor(s) Address:

Beverly J Cary
27834 31ST PL S,
AUBURN, WA 98001

Page 11 of 13

Transaction ID: 201907-CARY-01

## ACKNOWLEDGMENT

STATE OF WASHINGTON )
                             ) ss.
COUNTY OF _King_ )

       I certify that I know or have satisfactory evidence that _BEVERLY J. CARY_ is/are the person(s) who appeared before me, and said person(s) acknowledged that he/she/they signed this instrument and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in this instrument.

DATED: _July 23 2019_            _(signature)_

                             Print Name: _Kim Nelson_

                             NOTARY PUBLIC for the State of
                             _Washington_ , residing at
                             _Kent - USA_

```
KIM NELSON
Notary Public
State of Washington
My Appointment Expires
May 12, 2021
```

                             My appointment expires:
                             _05\12\2021_

130134.0003/7053876.3

## EXHIBIT A

## LEGAL DESCRIPTION

The Land referred to herein below is situated in an Unincorporated Area in the County of KING, State of Washington, and is described as follows:

LOT 4, THE RESERVE AT STAR LAKE, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 216 OF PLATS, PAGE(S) 72 THROUGH 76, RECORDS OF KING COUNTY, WASHINGTON.

FOR INFORMATION ONLY: LOT 4, THE RESERVE AT STAR LAKE, VOL 216, PG 72-76, KING COUNTY, WA.

APN #: 723759-0040

130134 0003/7053876.3